**DYNALECTRON
CORPORATION, Plaintiff,**

v.

**UNITED STATES, et al., Defendants.**

**Civ. A. No. 87–0014.**

United States District Court,
District of Columbia.

Feb. 26, 1987.

Joseph J. Petrillo, Richard O. Duvall, Stephen A. Bogorad, Paul J. Kiernan, Dunnells, Duvall, Bennett & Porter, Washington, D.C., for plaintiff.

Mark E. Nagle, Asst. U.S. Atty., Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

SPORKIN, District Judge.

This is a disappointed bidder's case. Plaintiff Dynalectron lost out to RCA in its pursuit of a United States Navy contract to operate and manage the Navy's Pacific Missile Range Facility ("PMRF") in Kauai, Hawaii. Plaintiff brought this action to contest the award of the contract to RCA, alleging irregularities in the contracting process.

The case is before me on plaintiff's Motion for Preliminary Injunction. Because of the importance of the case to the parties, I held extensive hearings on February 13, 18, 19, and 20, 1987, during which live testimony was elicited from four witnesses and several depositions were read into the record. Additionally, the parties presented extensive arguments at the conclusion of the testimony. The following represent my findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. On August 16, 1985, the Naval Regional Contracting Center, Long Beach ("NRCC"), issued a solicitation (Tab 1A of the Administrative Record) for operations, public works, maintenance logistics and other services at PMRF, for a period of one year with four one-year option periods. The services are currently under contract to Dynalectron, which has operated the facility for the past fifteen years. The current contract expired on September 30, 1986, but has been extended twice, because of delays in the procurement process, until March 1, 1987.

2. The Contracting Officer for the solicitation was Ms. Gayle Walker. Because no other official was designated a "source selection authority," Ms. Walker had the responsibility to select the source for contract award. See 48 CFR 15.604(c).

3. The solicitation was for award of a cost-reimbursement award fee contract. Tab 1.

4. Section M of the solicitation informed offerors that award would be made to "that responsible offeror whose offer, conforming to the solicitation, is determined to be most advantageous to the Government, cost and other factors considered." Tab 1A at 42. That determination was to be made through utilization of a numerical scoring process, in which technical and management factors were accorded 75% of the total weight and cost factors were accorded 25%. Tab 2 at 17.

5. Initial proposals were received on January 6, 1986 from four bidders. The proposals were evaluated by a Technical Evaluation Board at PMRF. Finding all of the offers within the competitive range, the Board ranked them numerically and reported deficiencies to the Contracting Officer. Tabs 5 and 8. A simultaneous cost analysis by the Defense Contract Audit Agency ("DCAA") found both Dynalectron's and RCA's proposals acceptable for cost purposes. Tab 9C and 9D.

6. The contracting officer, Ms. Gayle Walker, held negotiations with each of the

offerors during the week of July 2, 1986. Fed. Def. Proposed Finding 14.

7. Best and Final Offers ("BAFO's") were submitted by all the offerors on July 18, 1986. *Id.*, Finding 19.

8. The estimated *costs* of the proposals in question in their BAFO's were:

| | |
|---|---|
| Dynalectron (primary) | $137,250,932 |
| Dynalectron (alternate) | 121,016,841 |
| RCA | 111,698,012 |

Tab 17A at 9. Dynalectron's cost estimate was for full performance of the contract over sixty months of performance. Fed. Def. Proposed Finding 7, *citing* Tab 1, Attachment 9, page 6; Pl. Proposed Finding 12, *citing* Tab 12A. By contrast, RCA's cost estimate was for a shorter 58 month period. Were RCA to be awarded the contract, there would be a two month phase-in period for which the government would have to pay, but which was not reflected in RCA's cost estimate. *Id.*

9. As to *technical* scores, three members of the Technical Evaluation Board came to NRCC, Long Beach, from PMRF to evaluate the BAFO's. Fed. Def. Proposed Finding 20; Pl. Proposed Finding 13. The results of PMRF's technical evaluation were:

| | |
|---|---|
| 1. Dynalectron (primary) | 96.05 |
| 2. Dynalectron (alternate) | 87.08 |
| 3. [offeror not part of litigation] | |
| 4. RCA | 83.58 |

Tab 13B. These three technical reviewers also undertook a cost analysis. In order to compare the cost estimates on a consistent 60 month/full performance basis, the reviewers adjusted RCA's cost from $111,698,012 to $115,370,066. Based on this upward adjustment, they rated the offerors according to cost as follows:

| | |
|---|---|
| 1. RCA | 24.30 |
| 2. Dynalectron (alternate) | 23.17 |
| 3. Dynalectron (prime) | 20.43 |

*Id.* Finally, these three evaluators undertook a total Greatest Value Method ("GVM") computation using the 75%/25% method outlined above, *see* Finding 4, *supra.* Their results were as follows:

| | |
|---|---|
| 1. Dynalectron (primary) | 95.43 |
| 2. Dynalectron (alternate) | 91.17 |
| 3. [offeror not part of litigation] | |
| 4. RCA | 89.56 |
| 5. [offeror not part of litigation] | |

Tab 13B.

10. The three evaluators presented their results to the Contracting Officer on August 1, 1986, while they were still at Long Beach. On hearing that their recommendation was for Dynalectron, the Contracting Officer responded that she "had hoped the recommendation would have been for an award to an offeror other than Dynalectron." Walker Deposition Exhibit ("Deposition Exhibit") 6, at 4. *See also* Fed. Def. Proposed Finding 22. The Contracting Officer testified that she did not make this statement and would not make a statement such as this. Walker Testimony Tr. at _____.[1] However, one of the PMRF evaluators, Mr. Ponte, made a record of the statement in a chronology he wrote before this litigation commenced. Deposition Exhibit 6. He confirmed that this statement was made in his deposition. Ponte Deposition at 54–56. Moreover, one of the other evaluators present at the time, Mr. Bonaventure, also confirmed that the Contracting Officer made a statement of somewhat similar purport. Bonaventure Testimony Tr. at _____. In light of these factors, I cannot credit Ms. Walker's denial of having made such a statement and I credit the statement which appears in the chronology.

11. Subsequently, on September 12, 1986, PMRF complained to NRCC that RCA was "a technically inferior vendor who 'bought in' to get the contract award." Tab 16. Shortly thereafter, the Pacific Missile Test Center ("PMTC"), which is the command over PMRF, became concerned that the Contracting Officer might disregard the technical panel's recommendation that the contract be awarded to Dynalectron on the basis of its GVM score and instead award the contract to RCA solely on the basis of its lower cost estimate. Tab 15, ¶ 2. Accordingly, on September 17, 1986, PMTC sent a memorandum—drafted

---

1. Transcripts of testimony in this case have not yet been prepared. Accordingly, I am unable to cite to page numbers of trial testimony.

by one of the evaluators who had been at Long Beach—to the Commanding Officer of NRCC which noted that 39 expert evaluators had concluded that PMRF's requirements "could not be met" by RCA. *Id.* at ¶ 3. According to the letter, RCA's proposal had 29 major deficiencies, 10 of which were deemed "critical." *Id.* at ¶ 4.

12. The Contracting Officer, in her review of the proposals, made two significant changes to the GVM score which had been presented to her, Finding 9, *supra:*

a. *first,* the Contracting Officer reduced Dynalectron's raw technical score by "five points" after deciding the company should receive no credit (a zero) instead of the full credit (a four) granted by PMRF in a category entitled "Small Business Utilization." Tab 14. The Contracting Officer did this because she believed the comprehensive small business subcontracting plan submitted by Dynalectron did not, despite the company's proven commitment to small business in its fifteen years on the contract, rise to the level of an "actual commitment" and thus was entitled to *no* credit. *Id.* The requirement that an offeror "actually show committments [sic] to small business via proposed subcontracts and teaming arrangements," *id.,* was not a part of the RFP and was never put in writing. The Contracting Officer testified that she orally announced this requirement at the proposal conference, Walker Testimony Tr. at ____, but testimony by others at the conference fails to confirm her recollection. Bonaventure Testimony Tr. at ____; Ponte Deposition at 20–21, 40, 44–46. Moreover, the tape recording of the proposal conference has been lost. Based on the state of the record, I cannot find that plaintiff was aware that it was required to submit actual sub-contracts with its proposal. It is obvious that if the requirement had been in the RFP or if the plaintiff had otherwise been aware of it, it would have complied with it.

b. *second,* the Contracting Officer reduced RCA's cost estimate. Although she accepted PMRF's decision to raise RCA's cost estimate so as to put it on a comparable time period basis with Dynalectron's, *see* Finding 9, *supra,* she reduced the magnitude of this upward adjustment. Fed. Def. Proposed Finding 28–30. She did this after coming to Washington in December, 1986, and meeting with representatives of the Navy Systems Command ("NAVSUP"). NAVSUP was involved because, due to the high dollar value of this contract, Navy regulations require approval of the Assistant Secretary of the Navy. Fed. Def. Proposed Finding 40. To receive this approval, the Contracting Officer had submitted a "Business Clearance Memorandum," which resulted in her being summoned to Washington as described above. *Id.*

13. After returning from Washington, and making the changes outlined at Finding 12, the Contracting Officer rescored the proposals as follows:

|  | Tech Score | Cost Score | Total |
| --- | --- | --- | --- |
| RCA | 70.39 | 25 | 95.39 |
| Dynalectron (P) | 75.00 | 20.35 | 95.35 |
| Dynalectron (A) | 67.40 | 23.10 | 90.50 |

Tab 17A at 9.

14. The Contracting Officer then, in December 1986, prepared a second Business Clearance Memorandum, to which she attached the cover page of the earlier, November 4, 1986, Business Clearance Memorandum. *Compare* Tab 17A (final Business Clearance Memorandum) *with* Deposition, Exhibit 2 (original Business Clearance Memorandum). She also attached the same signature page that had accompanied the original Business Clearance Memorandum, although the persons signing the original Memorandum never saw the second version. Walker Testimony Tr. at ____. The final Business Clearance Memorandum differed from the earlier version in three respects. *First,* it dropped the earlier finding of "technical equality," and justified award to RCA on the basis of its

scoring the highest GVM points. *Second,* the latter document deleted references to changes the Contracting Officer had made in the GVM scores. Finally, the September 17, 1986 letter from PMTC criticizing RCA technical competence, see Finding 11, *supra,* was *not* attached to the second Business Clearance Memorandum as it had been to the first. *Compare* Tab 17A (final Business Clearance Memorandum) *with* Deposition, Exhibit 2 (original Business Clearance Memorandum).

15. The final Business Clearance Memorandum also made no mention of conversations the Contracting Officer had conducted with RCA *after* BAFO's had been submitted. Specifically, about the time she was evaluating the BAFO's and making the changes to the scoring outlined above, *see* Findings 12–14, the Contracting Officer contacted RCA about its proposal. Walker Declaration at ¶ 28. The call concerned RCA's cover letter to its BAFO, in which it had offered to *"negotiate* a ceiling on base labor dollars."* Tab 12, cover letter at 4 (emphasis supplied). The Contracting Officer spoke with an RCA representative about whether, by this statement, RCA agreed that if more labor hours were needed to comply with the contract, RCA would provide the additional labor hours to the government for no additional charge. Walker Declaration at ¶ 28. RCA so agreed.

16. RCA's agreement to a labor ceiling and the "final" Business Clearance Memorandum, *see* Finding 14, *supra,* were then re-submitted to and approved by NAVSUP and the Assistant Secretary of the Navy. Accordingly, NRCC awarded the Contract to RCA. The contract contained a ceiling on labor hours for the first two of five performance periods, which, at trial, RCA agreed to extend for the full five year period.

17. By letter dated December 23, 1986, Dynalectron filed a protest with the General Accounting Office ("GAO") challenging award to RCA. Tab 19A.

18. On December 29, 1986, Rear Admiral R.B. Abele, the Vice Commander of NAVSUP, awarded the contract to RCA despite the protest because "urgent and compelling circumstances which significantly affect the interests of the United States will not permit awaiting the decision of GAO." Tab 19B. RCA was awarded the contract the same day.

19. Dynalectron instituted this suit on January 2, 1987.

## CONCLUSIONS OF LAW

1. In a Motion for Preliminary Injunction, plaintiff must show that (1) there is a substantial likelihood that it will prevail on the merits, (2) the injunction is necessary to prevent irreparable injury, (3) the threatened injury to the plaintiff outweighs the possible harm to others, and (4) the public interest justifies issuance of the requested relief. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977), *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958).

2. As this case arises under the Administrative Procedure Act, as amended, 5 U.S.C. §§ 701, *et seq.,* to prevail on the merits in the underlying case at issue, plaintiff must show that the administrative decision below was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

a. One indicia of arbitrary and capricious action by the government in a contract procurement is "subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal ..." *Keco Industries, Inc. v. United States,* 492 F.2d 1200, 1203, 203 Ct.Cl. 566 (1974). *See also Heyer Products v. U.S.,* 140 F.Supp. 409, 135 Ct.Cl. 63 (1956).

b. Moreover, the "arbitrary and capricious" standard, as applied in previous government contracting cases, requires that the plaintiff prove that the contracting officer's decisions had no rational basis, *or* that "the procurement procedure involved a clear and prejudicial violation of applica-

ble statutes or regulations." *Kentron Hawaii, Ltd., v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973). One of the applicable statutes at issue is the Competition in Contracting Act, 10 U.S.C. § 2304, which guarantees a full and open contracting process.

c. Thus, if plaintiff can show a biased and unfair contracting process, it can prevail in the underlying action.

3. Applying this standard to the extensive record developed in this case I conclude that the plaintiff has a likelihood of succeeding on the merits. Dynalectron has introduced substantial evidence indicating that the process here was flawed and that its bid was not fairly and impartially considered. There are several reasons I find this to be so.

a. First, I conclude that the Contracting Officer appears to have been biased against the plaintiff. Her statement to the two PMRF examiners, Mr. Bonaventure and Mr. Ponte, on August 1, 1986, that she had wished they had brought her anyone but Dynalectron is evidence of this bias on her part. *See* Finding 10, *supra.*

b. My conclusion about the Contracting Officer's partiality is buttressed by several other incidents which took place in the course of awarding this contract which have not been sufficiently explained. The first of these is the re-scoring of the small business area by the Contracting Officer so as to give Dynalectron no points. *See* Finding 12(a), *supra.* This re-scoring significantly narrowed the margin between Dynalectron's proposal and RCA's proposal in the point scoring. It is also against the great weight of evidence. There is substantial evidence that Ms. Walker knew, or should have known, that Dynalectron had a sufficient commitment to small business to warrant some points. For instance, evidence presented at trial showed Dynalectron's significant commitment to small business in the course of its present contract with PMRF. Moreover, there is little doubt that had Dynalectron been aware of the Contracting Officer's oral requirements—if such had in fact been articulated—for small business proposals, it would have complied. While I understand

the Contracting Officer's explanation of why she rescored Dynalectron—to treat it the same way she was treating another bid—I find this explanation to be unacceptable. There were ways to achieve parity between Dynalectron and this other bidder; taking all of Dynalectron's points away, though, simply was not a fair way to address the problem.

c. A third reason I conclude there was a biased process here stems from the adjustments made to RCA's cost estimate by both the Contracting Officer and NAVSUP, and the subsequent actions taken with respect to the Business Clearance Memoranda. *See* Findings 12(b) and 14. While some adjustment may have been necessary to *all* of the parties' cost estimates so as to compare them to one another, the evidence presented here indicates continuing adjustments to the proposals to ensure that RCA emerged with the highest GVM score.

d. A fourth indication of bias is the Contracting Officer's phone calls to RCA after the best and final offers had been submitted. Though these phone calls have been characterized as "clarifications" and not further "discussions," I am not persuaded that they did not "involve information essential for acceptability or revision of a proposal." *See* 48 C.F.R. 15.601. If the conversations did in fact rise to the level of discussions, the Contracting Officer had a legal obligation to reopen such discussions with all of the parties. I also find it difficult to understand why the Contracting Officer could call RCA for "clarification" on this issue, but could not call Dynalectron for clarification when she felt its proposal was deficient, namely on the small business issue. This differing treatment of similar situations is just the sort of appearance of bias that a Court must protect against.

4. Each of the incidents outlined in Conclusion 3, *supra,* cause even greater concern when considered in combination. They present a compelling picture that the process here was flawed and that the plaintiff was deprived of its basic right to be treated fairly in the contracting process. Indeed, there may well have been a manip-

ulation of the process in order to prefer one contractor over another.[2] Therefore, I conclude there is a likelihood of success on the merits in plaintiff's case.

5. I also conclude that if preliminary relief is not granted, Dynalectron will be fully phased-out of the PMRF operation and will be irreparably injured.

6. Since RCA's new contract has not commenced, preliminary relief will not harm them as much. I also find that the government will be harmed less if Dynalectron continues performing the contract pending outcome of this dispute. Thus, I conclude that the "balance of harms" is in plaintiff's favor. A preliminary injunction is clearly the best way to preserve the status quo until a final decision can be made.

7. Finally, I conclude that preliminary relief is in the public interest. Dynalectron has been performing under the contract without incident for fifteen years; it can best continue to do so until final relief can be fashioned. Dynalectron has represented that it will continue performing the current contract, at no fee, pending outcome of this litigation.

For these reasons, I am prepared to grant preliminary relief, to stay the phase-in of RCA on the new contract, until a final decision can be made. In expressing my concerns in this case, I am not making a judgment about whether Dynalectron's offer was "better" or "worse" than RCA's. I do not have the expertise to, nor will I, make such a decision. I want the parties to understand that even if final relief is granted, one likely form of such relief would be a new bidding process. In that process, RCA, Dynalectron, and all other interested contractors, would have an equal opportunity to bid for the contract. My concern is *not* that RCA was granted this contract; rather, my concern once again is that Dynalectron's chances of winning the

contract were prejudiced. An appropriate order accompanies this memorandum.

### PRELIMINARY INJUNCTION ORDER

For the reasons set forth in the Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction rendered February 25, 1987, it is, this 25th day of February, 1987, hereby

ORDERED that the plaintiff's Motion for Preliminary Injunction be granted and therefore further

ORDERED that the United States government, by its appropriate agents, stay the phase-in of RCA as the new contractor to the government at the Pacific Missile Range Facility as of the date of this Order and until further order of this Court and further

ORDERED that Dynalectron Corporation continue performance under its existing contract at the Pacific Missile Range Facility, at no fee to the government, until further order of this Court.

---

**2.** I am not unmindful that the RCA proposal could save the government a considerable amount of money if no upward cost adjustments are made during its term. I also understand how this could be a significant factor in a decision by a sincere contracting officer in making an award. Such good intentions, however, cannot justify acts that prevent another contractor's offer from being treated fairly and impartially, and can never justify the manipulation of the scoring of a proposal to render a preordained decision.