GE GOVERNMENT SERVICES,
INC., Plaintiff,

v.

The UNITED STATES of America,
et al., Defendants.

Civ. A. No. 92–0453 (JHG).

United States District Court,
District of Columbia.

March 31, 1992.

---

John M. Vardaman, Jr., F. Whitten Peters, Kevin M. Hodges, Paul Mogin, Williams & Connolly, Washington, D.C., for plaintiff.

Sally M. Rider, Asst. U.S. Atty., Washington, D.C., for defendants.

Kenneth S. Kramer, Fried, Frank, Harris, Shriver & Jacobsen, Washington, D.C., for defendant-intervenor AUTEC Range Services.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This litigation concerns the validity of a government contract award made to intervenor-defendant AUTEC Range Services ("ARS") by defendant United States Navy. Plaintiff GE Government Services, Inc. ("GEGS"), a bidder for the contract, challenges the award's validity under the Administrative Procedure Act ("APA"), as amended, 5 U.S.C. §§ 701 *et seq.*, the Competition in Contracting Act ("CCA"), as amended, 10 U.S.C. §§ 2301 *et seq.*, and the Federal Acquisition Regulations System ("FAR"), 48 C.F.R. Chapter 1. Specifically, GEGS claims the selection of ARS as awardee was arbitrary and capricious and tainted by bias. Plaintiff seeks an injunction nullifying the award and a declaratory judgment that the Navy either must award the contract to GEGS or must initiate a resolicitation of bids. Upon consideration of all filings in this case, including the administrative record, and after considering the evidence introduced at the hearing, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had opportunity to evaluate, judgment is entered in favor of the defendants and the intervenor-defendant and against the plaintiff.

## I. PROCEDURAL HISTORY

This action commenced on February 20, 1992 with the filing of a complaint and a motion for a temporary restraining order ("TRO"). Named as defendants were the United States of America, the Secretary of the Navy, and a Contracting Officer of the Navy who participated in the contract award. The TRO motion was referred to then-motions Judge Gerhard Gesell for resolution. At a hearing held on February 21, 1992, Judge Gesell allowed ARS to intervene as a defendant and, for reasons stated in open court, denied GEGS's motion for a TRO. Immediately following the hearing, this Judge held a status conference to determine the future progress of the case.

Because the contract at issue is scheduled to commence on April 1, 1992, plaintiff requested, without objection, that this case be placed on an expedited schedule. That request was granted upon the conditions that the parties adhere to a strict briefing schedule and that they tailor their discovery requests accordingly. The parties agreed and on March 9, 1992, in accordance with the briefing schedule, plaintiff filed a brief superseding its earlier complaint. On March 17, the United States and ARS filed motions for summary judgment. GEGS filed what it styled as a "reply" on March 19, 1992, and with the permission of the Court, filed on the second day of the hearing, March 23, 1992, a "Memorandum in Opposition to Defendants' Motion for Summary Judgment and Concerning the Navy Official Authorized to Select the Winning Offeror."[1] Although defendants and intervenor-defendant filed statements of material facts not in dispute, neither plaintiff's "reply" nor its "opposition" contained

---

1. Although counsel for GEGS styles the filing as an "opposition," the memorandum is primarily a response to testimony of William A. Mackinson provided at the hearing on March 20, 1992.

statements of material facts in dispute. *See* Rule 108(h) of the Rules of the United States District Court for the District of Columbia. *See also* Fed.R.Civ.P. 56. Defendants and intervenor-defendant presented their replies to GEGS's opposition on March 25, 1992.

The hearing was held on March 20 and 23, 1992 during which each side was permitted equal time to present and cross-examine witnesses, tender exhibits, and make legal arguments. Testimony concerning the alleged bias of John Keegan, a Navy employee who participated in the procurement, and concerning the decisionmaking process which led to the naming of ARS as the contract awardee was proffered and is described below.

## II. FACTUAL FINDINGS

### A. The AUTEC Program

The Atlantic Undersea Test and Evaluation Center ("AUTEC"), a United States Navy deepwater testing and evaluation facility, is headquartered in West Palm Beach, Florida and has a test range operations base on Andros Island, Commonwealth of the Bahamas. The Navy uses AUTEC, *inter alia,* to evaluate anti-submarine warfare combat systems and weapons, to test torpedo performance, to calibrate sonar systems, and to collect underwater, surface, and in-air tracking data on ships, submarines, aircraft, and weapon systems. Administrative Record ("A.R.") Tab 12A at 8; A.R. Tab 28 at 4; Plaintiff's Exh. 1.

The responsibility for overall technical, administrative, operational, and financial control of AUTEC has been delegated by the Commander of the Naval Underwater Systems Center ("NUSC") in Newport, Rhode Island to the AUTEC Program Manager, and the Navy employs a civilian contractor to carry out the day-to-day activities required to meet overall objectives of the AUTEC project. A.R. Tab 7 at 7. Because AUTEC's Andros Island facility is designed to be self-sufficient, the duties of the civilian contractor range from operation and maintenance of technical programs to the management of food and laundry services, housing, and utilities operations.

GEGS's corporate predecessor first began providing maintenance and operation ("M & O") services to AUTEC when the center commenced operations twenty-five years ago, and continued performing such services as GEGS, which was most recently awarded a five-year AUTEC contract in 1986. Because that contract is scheduled to expire on March 31, 1992, the Navy began preparations in the Fall, 1990 for issuance of a new contract to take effect on April 1, 1992.

### B. Relevant Procedures Governing the AUTEC Contract Procurement

Basic guidance for all or most governmental contracting procedures is provided by the Federal Acquisition Regulations System, 48 C.F.R. Chapter 1. For purposes of defense contracts, the Department of Defense has interpreted and implemented the FAR, creating what is known as the Department of Defense Federal Acquisition Regulations System ("DFAR"). In turn, the Navy determines which FAR and DFAR provisions are particularly appropriate to its contracting decisions and further clarifies those provisions in the Navy's Acquisition Procedures and Supplement ("NAPS").

According to the testimony of William A. Mackinson, the Naval Supply Systems Command ("NAVSUP") Competition Advocate and the senior civilian for the Navy field contracting system,[2] the Assistant Secretary of the Navy for Research, Development, and Acquisition issues charters granting specific contracting authority to certain subdivisions of the Navy. The primary contracting authority is entitled the "Head of Contracting Activity" ("HCA"). According to the NAPS, NAVSUP is the HCA for the Naval field contracting system, and all of the "field activities," *i.e.,*

---

**2.** Mr. Mackinson's testimony was refreshingly clear, informative, and uncontroverted in all material instances. It was highly credible and is adopted in full. Almost all of the factual findings relating to the contracting procedure used in this case are based on the administrative record and Mr. Mackinson's testimony.

commands located outside of Washington, D.C. which purchase supplies and services for the Navy, receive their contracting authority from NAVSUP. NAVSUP oversees, reviews, periodically audits, controls, and issues policy guidance to the field activities and remains accountable for all aspects of the field activities' performance. When participating in a contract procurement, field activities are bound to follow certain procedures set forth in NAVSUP Instruction ("NAVSUPINST") 4200.79, drafted by Mr. Mackinson.

Because the AUTEC contract did not involve a major weapon systems acquisition, procurement in this case came under the jurisdiction of NAVSUP, and NAVSUP delegated part of its contracting authority to its contracting office in Orlando, Florida, the Naval Training Systems Center ("NTSC"). NAVSUPINST 4200.79 required NTSC to employ a panel to evaluate the contract proposals in a fashion similar to the manner in which a Source Selection Evaluation Board ("SSEB") reviews proposals for major weapon systems contracts, and to utilize another panel which would evaluate proposals in a manner similar to the methods a Source Selection Advisory Council ("SSAC") uses to review a major weapon systems contract. Additionally, NAVSUPINST 4200.79 required the appointment of an evaluation chairman to provide oversight and review of the procedures employed by the evaluation panels and to report and provide information to the Contracting Officer at NTSC. For purposes of the AUTEC contract, the evaluation chairman, or Source Selection Authority ("SSA"), was John Keegan. Although the NTSC could have named the evaluation panels and chairman differently, upon creation of the panels, it decided to give them the same titles used to describe actors employed in major weapon systems procurement, *i.e.*, "SSEB," "SSAC," and "SSA."

It is important to note that the panels and chairman in this case did not have the same authority as their similarly named counterparts who participate in major weapon systems procurements. Unlike the procedures used in a major weapon systems acquisition, the SSA in this case was required to report his decision to the NTSC Contracting Officer, Paul Brothers, who in turn, was charged with reviewing the SSA's decision paper in its entirety and determining if the decision was properly substantiated by the SSEB and the SSAC reports. Under NAVSUPINST 4200.79, the Contracting Officer is personally accountable and liable for all contracts he reviews and subsequently signs. Although the regulations may allow the Contracting Officer to delegate his responsibilities to the SSA, in this case, the Contracting Officer made no such delegation.

The regulations applicable to the AUTEC procurement also required the Contracting Officer to obtain review and approval of his decision by the Commanding Officer of NTSC, Michael Kalapos. Thereafter, if Captain Kalapos agreed with Mr. Brothers' decision, he was to submit his findings in a "Business Clearance Memorandum" to the NAVSUP Competition Advocate, Mr. Mackinson. As testified at the hearing and as the regulations make clear, Mr. Mackinson was vested with the ultimate authority to reject or accept the decisions of the SSA, the Contracting Officer, and the Commanding Officer. The final agency decision to award the AUTEC contract to ARS was made by Mr. Mackinson in his capacity as the NAVSUP competition advocate.

### C. Solicitation, Submission, and Review of Bids for the AUTEC Contract

On November 30, 1990, the Navy issued a "Source Selection Plan" (A.R. Tab 7), which articulated the type of contract to be awarded in this case, listed internal administrative procedures to be followed, set an overall operating schedule, assigned certain responsibilities, and summarized evaluation criteria applicable to the selection of the AUTEC contract awardee. According to the plan, the contract to be awarded was to be of a "cost plus fee award" type, *i.e.*, the contractor would be paid a "base fee," a fixed amount which does not vary with performance, and an "award fee," an amount determined subjectively following evaluation of performance as measured

against performance criteria set forth in the contract.

In early 1991, pursuant to § 2.1 of the Source Selection Plan, the Navy issued a Request for Proposals ("RFP") which solicited competitive bids for the new AUTEC contract. Section M of the contract solicitation informed interested bidders that

> The Government will make award to that responsible offeror whose proposal offers the best value to the Government. That best value shall be that offer which provides the most beneficial mix of technical approach, cost and other facts for the work specified by this solicitation. Accordingly, award may be made to other than the lowest price, technically acceptable offeror.

A.R. Tab 2 at § M–2. The solicitation requested bidders to submit offers in four "volumes," with volumes one through three addressing the technical aspects of the contract and volume four addressing cost. The solicitation informed bidders that "the total technical proposal will be considered to be more important than the cost proposal," A.R. Tab 2 at § M–3, but cautioned that the cost proposal, "while of lesser importance than the combined technical volumes, is also a major evaluation element and can gain in significance if the relative degree of evaluated difference between competing technical proposals is small." *Id.* at page M3. The RFP also advised offerors that cost proposals would be subjected to a "cost realism analysis" to determine "if the overall costs [proposed] are realistic for the work to be performed." *Id.* If the Navy found a bidder's estimated cost of performing the contract to be unrealistic, it would adjust, either upward or downward, the estimated cost of the bid before determining which proposal offered the best value to the government.

On April 15, 1991, GEGS, ARS, and three other offerors submitted initial proposals for the new AUTEC contract. The SSEB, a group of more than thirty evaluators, reviewed the bids to determine whether they met or exceeded the technical requirements of the solicitation, and assigned adjectival ratings to technical elements of the proposals ranging from "outstanding" to "unacceptable." The criteria for assigning the ratings is set forth in A.R. Tab 7 at § 4.3.

In July, 1991, the SSEB issued a 457–page Proposal Evaluation Report ("PER") outlining their evaluations of the five initial proposals. That PER assigned overall ratings of "highly acceptable" to all three technical volumes of GEGS's proposal, A.R. Tab 11 at 15, 31, 43, and rated ARS's first two technical volumes "acceptable" and the third "marginal." *Id.* at 6, 22, 37. The SSEB, however, did not make any source selection recommendations and did not rank or otherwise compare the proposals. A.R. Tab 7 at § 3.2.2; A.R. Tab 11; Testimony of William A. Mackinson.

In accordance with Source Selection Plan § 3.2.2 and other above-mentioned regulations, the SSEB forwarded its PER to the SSAC, which consisted of four individuals and which was advised by Mr. Brothers, the Contracting Officer. The SSAC reviewed the SSEB's evaluation and concurred with the adjectival ratings contained therein. The SSAC determined, however, that due to deficiencies in all of the initial proposals, no contract should be awarded without revision of the bids. The SSAC also recommended that only GEGS and ARS should remain in the bidding process, specifically finding that although GEGS's initial proposal contained "fewer weaknesses than any of the others," A.R. Tab 12B at 2, ARS's initial proposal "warrants merit" and that it was unlikely that the other three bidders ultimately would be selected for the contract award. *Id.*

Upon receipt and review of the SSEB and SSAC reports, the SSA, Mr. Keegan, concurred with the adjectival ratings given to the five initial proposals, and agreed with the SSAC that, due to technical deficiencies in all initial proposals, the source selection process should continue and the bidding be limited to the two lowest cost, most highly rated offerors, ARS and GEGS. A.R. Tab 12C.

On July 28, 1991, Mr. Keegan's decision was reviewed and approved by Mr. Brothers and Captain Kalapos. That approval

was embodied in a "Pre–Negotiation Business Clearance Memorandum," which was given final and unconditional approval by Mr. Mackinson at NAVSUP. A.R. Tab 12A at 2.

After revising their initial proposals, GEGS and ARS submitted their best and final offers ("BAFOs") for the AUTEC contract on November 4, 1991. In a 355–page final Proposal Evaluation Report issued in December, 1991, the SSEB determined that all three of GEGS's BAFO technical volumes should be rated "highly acceptable." The SSEB's final PER rated all three of ARS's BAFO technical volumes "acceptable," which was an upward departure from the two "acceptable" and one "marginal" ratings given for the initial proposal. The SSEB also reviewed the cost volumes and after making the appropriate cost realism adjustments, determined that ARS's proposal would cost the Navy $15 million less than GEGS's proposal.

Upon review of the BAFOs and of the SSEB's final PER, the SSAC concluded that the AUTEC contract should be awarded to ARS. John Keegan, the SSA, concurred with the SSAC's conclusion as did the Contracting Officer and the Commanding Officer of the Contracting Office. Mr. Brothers and Captain Kalapos reported their conclusions in a Business Clearance Memorandum which was forwarded to Mr. Mackinson.[3] After reviewing the Business Clearance Memorandum and accompanying documentation, Mr. Mackinson concluded that this Memorandum "relied too extensively on the ability of the reader to draw conclusions from the SSAC report, the SSA report, and the SSEB evaluations." Transcript at 1B–27. Because he determined that the Business Clearance Memorandum did not make clear why the government should not pay $15 million dollars for the additional technical merit which GEGS's final proposal offered, he declined to grant his approval of this Memorandum and requested additional documentation supporting the decision to award the contract to ARS. *Id.*

Accordingly, in January, 1992, the Chairman of the SSAC provided to the SSA a newly drafted and more-detailed memorandum justifying its recommendation that ARS be awarded the contract. The SSAC's new memorandum reported that although the SSAC initially concurred with the SSEB's adjectival ratings of the ARS and GEGS proposals as "acceptable" and "highly acceptable," closer review of the SSEB's evaluations revealed errors. Specifically, the SSAC concluded that the SSEB mistakenly awarded the GEGS's proposal increased technical merit credit because it provided more detail and information than was required. A.R. Tab 26 at ¶¶ 6, 7 and accompanying enclosures; Testimony of William A. Mackinson. After making its own adjustments, the SSAC rated all three of GEGS's technical volumes "acceptable," and concurred with the SSEB that all three of ARS's technical volumes were "acceptable." Based on the conclusion that any additional technical merit of the GEGS's proposal was not worth the extra $15 million it would cost, the SSAC again recommended to the SSA that ARS receive the AUTEC contract. A.R. Tab 26 at ¶ 8 and addendum page 3. The SSA reviewed the SSAC memorandum and agreed that additional technical merit of the GEGS's proposal was not worth $15 million. A.R. Tab 27 at ¶ 5. Consequently, on January 7, 1992, the SSA issued a detailed decision stating that ARS should be awarded the contract.

The Contracting Officer and the Commanding Officer of the Contracting Office agreed with the SSA's decision and issued a new Business Clearance Memorandum the next day stating that the contract should be awarded to ARS and providing detailed reasoning for their conclusion. A.R. Tab 28. The new Business Clearance Memorandum was sent to Mr. Mackinson who fully reviewed the SSEB and SSAC reports which assigned conflicting adjectival ratings to the GEGS's technical volumes, the SSA's decision, and the Contracting Office's Business Clearance Memoran-

3. According to representations of counsel for the defendants, this Business Clearance Memorandum was destroyed. Consequently, a copy of the document is not contained in the administrative record.

dum. Satisfied that each report presented sufficient supporting detail, Mr. Mackinson concurred with the SSAC, the SSA, the Contracting Officer, and the Commanding Officer that the additional technical merit of the GEGS's proposal was not worth an additional $15 million dollars and that the ARS proposal offered the best value to the government. As a result, he signed on January 10, 1992 the January 8 Business Clearance Memorandum, thereby granting unconditional approval of the contract award to ARS. A.R. Tab 28 at 2. The contract award was announced to the public on January 15, 1992.

D. The SSA's Bias (or Lack Thereof)

At the hearing, plaintiff introduced the testimony of several witnesses in an attempt to show that the SSA, John Keegan, was biased against GEGS and that the AUTEC contract was awarded to GEGS because of his bias.

The most significant testimony offered to establish bias was that of Sharon Carlson, an employee of GEGS who works as the educational manager at AUTEC. All of the below mentioned matters concerning the interactions between Ms. Carlson and Mr. Keegan have been taken from Ms. Carlson's testimony.

Ms. Carlson first met Mr. Keegan in 1989. At the next meeting discussed, sometime in the Fall, 1990, Mr. Keegan asked Ms. Carlson to go away with him for the weekend. Although she did not find the offer offensive, she responded, "Big talk" and declined his invitation. The next time Ms. Carlson saw Mr. Keegan was on January 11, 1991 at a party celebrating the accreditation of the AUTEC school. At the party and at a post-party meeting in a local bar, Mr. Keegan made known to Ms. Carlson that he was interested in having a social relationship with her.

In the early evening of a subsequent day, Ms. Carlson met Mr. Keegan while he was driving his car. He invited her to go for a ride and she accepted the invitation. Because it was obvious to Ms. Carlson that Mr. Keegan had been drinking, she insisted on driving, and Mr. Keegan obliged. During the drive, Mr. Keegan began touching Ms. Carlson's neck. She instructed Mr. Keegan to stop touching her, and he laughed and stopped. Ms. Carlson then drove back to the base and parked at Mr. Keegan's residence. He invited her to come inside, and after a brief protest, she accepted the invitation. The two began drinking wine and Mr. Keegan indicated that he found Ms. Carlson very attractive and stated that he would like to date her. Although she responded that she was not interested in a romantic relationship, he again touched her neck. Ms. Carlson became upset and blurted her protest in earthy language. Mr. Keegan retorted, "Maybe GE has had this contract too long." He then began to mock her voice and mannerisms. She became upset by his mocking and threw her wine on him. Later that evening Mr. Keegan phoned Ms. Carlson and they mutually apologized for what had happened. Ms. Carlson did not think that Mr. Keegan's statement about GEGS having the contract for too long indicated any intent to influence the contract award decision. Deposition of Sharon Carlson at 66. From mid-January, 1991 until after January 12, 1992, Ms. Carlson and Mr. Keegan had no consequential social or other contacts.

The only other statement made by Mr. Keegan to Ms. Carlson introduced to establish bias was a comment made after Mr. Mackinson granted approval of the final Business Clearance Memorandum. According to Ms. Carlson, after the contract decision was made but before it was announced, Mr. Keegan informed her, "I've done something for you." At the time he made that statement, he gave no detail as to what he meant by it, but on a later day he explained to Ms. Carlson that he had made sure that she could keep her job at the school for as long as she wanted.

In addition to Ms. Carlson's testimony, plaintiff introduced the testimony of two other GEGS employees to whom Mr. Keegan allegedly stated a belief that GEGS had the AUTEC contract for too long. According to the testimony of Ann Armstrong, editor of the Andros Island newspa-

per, Mr. Keegan told her in late March or the first week in April, 1991 that he thought GEGS had the contract for "too damned long." Additionally, Cheri Works, presently employed by GEGS in the AU-TEC finance office, testified that Mr. Keegan told her in July, 1990 when she was a hotel bartender that GEGS has had the contract for too long and has "gotten fat." Although Mr. Keegan has either denied or stated that he does not remember making such statements, the Court accepts as credible all of the above referenced testimony of Ms. Carlson, Ms. Armstrong, and Ms. Works.

■ In its effort to show bias, plaintiff also presented evidence establishing that Mr. Keegan told certain GEGS employees that he could help assure their continued employment if or when GEGS lost the contract. Ted Hopson, GEGS's Project Director for the AUTEC program, testified that on January 15, 1992, after the award to ARS was publicly announced, Mr. Keegan (Hopson's business and social friend) stated, "You have been an excellent manager [and] we would like you to continue running the program for us." Robert Parker, GEGS's Manager of Facilities Engineering at AUTEC, related that on that same day Mr. Keegan said that he could help Mr. Parker get a job with ARS at AUTEC. David Graham and Frank Hardy, also GEGS employees, likewise testified that after the contract award was made public, Mr. Keegan offered or assured them jobs with ARS. While the testimony of Parker, Graham, and Hardy was persuasive and is accepted as factual, it is also factual, as Mr. Parker asserted, that a succeeding contractor generally hires as much as ninety-three percent of its predecessor's workforce. The Court concludes that Mr. Keegan's offers or assurances neither show bias against GEGS nor favor towards ARS, constituting instead mere puffery made in an effort to gain favor with employees who would most likely have been hired by ARS anyway, without the help or influence of Mr. Keegan. Given that the Project Director of AUTEC is a high-level managerial position, the holder of which would not likely transfer from one contrac-

tor to another, Mr. Keegan's statement that he never offered Mr. Hopson the position of ARS's Project Director becomes the more persuasive.

■ Also in its effort to establish Mr. Keegan's bias, plaintiff introduced documentary evidence that Mr. Keegan is presently being investigated for having sexual relations with a GEGS employee in violation of SECNAVINST 5370.2J § 904 which provides, "Naval personnel shall not use their official positions to improperly induce, coerce, or influence any person, particularly subordinates, defense contractors, and potential defense contractors, to provide any benefit, financial or otherwise, to themselves or others." Although Mr. Keegan has acknowledged that during the first half of 1991 he had a sexual relationship with a GEGS employee, Deposition of John Keegan at 237–43, there is absolutely no evidence that the relationship influenced to any degree his determination that ARS should be awarded the contract.

Significantly, plaintiff has failed to introduce persuasive evidence that Mr. Keegan's alleged bias affected or influenced the decisions made by the SSEB, the SSAC, Contracting Officer Paul Brothers, Commanding Officer Michael Kalapos, or NAVSUP Competition Advocate William Mackinson. In fact, defendants' contrary evidence has been, in essence, uncontroverted. Mr. Mackinson testified, in compelling articulation, that Mr. Keegan made no attempt to directly interfere with Mr. Mackinson's decision to grant approval of the award decision and indeed these men had not spoken with each other for the eight years preceding the contract award. Transcript at 1B–28. Significantly, Mr. Mackinson testified that after independently reviewing the SSEB report, the SSAC report and recommendation, the SSA's review and decision paper, and the final Business Clearance Memorandum, he was independently satisfied that the ARS proposal provided the "best value" to the Navy, *i.e.*, that the additional merit of the GEGS's proposal was not worth an extra cost of $15 million, and that therefore ARS should be awarded the contract. Transcript at

1B–34, 1B–36. Mr. Mackinson was exceedingly sensitive to his personal liability and accountability for ensuring that the proper contracting policy has been followed. He emphasized his refusal in December to award the contract to ARS due to lack of sufficient detail in the reports submitted to him. His careful and thorough review throughout the contracting process, as explicated herein, provides further assurance of lack of bias on behalf of the ultimate decisionmaker in this case.

That testimony was bolstered also by the credible testimony of Shelton Hood, the Chairman of the SSAC, which establishes that Mr. Keegan never attempted to influence the decision of the SSAC and that the SSAC found, without any suggestion of improper influence, that ARS's proposal provided the best value to the Navy.

### III. LEGAL STANDARDS AND CONCLUSION

#### A. Review of the Contract Award Under the Administrative Procedure Act

■ Because a contract award decision is considered informal agency action for purposes of APA review, *see Doe v. Devine,* 703 F.2d 1319, 1322 (D.C.Cir.1983), the award decision would violate the APA only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To successfully challenge an agency's procurement decision under the APA, a plaintiff must meet the heavy burden of establishing "either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973) (citations omitted).

■ When reviewing an agency action under the APA, courts accord great deference to an agency's judgment, and there is a strong presumption that the agency has acted properly. *See Nat'l Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC,* 725 F.2d 1442, 1455 (D.C.Cir.1984). Significantly, courts are at their "most deferential" when called upon to review technical determinations on matters within an agency's expertise. *See Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C.Cir.1988).

■ Upon full review of the administrative record and the evidence presented at the hearing, the decision to award the contract to ARS is found to be completely rational. All of Mr. Mackinson's decisions made in the course of this procurement were well-reasoned, amply supported by the administrative record, and within his discretion. The decisions which he made involved technical matters within his expertise, and the Court simply cannot conclude that his concurrence with the SSAC's adjectival ratings, his finding that the difference in technical merit between the GEGS and ARS proposals was not worth $15 million, his ultimate conclusion that the contract should be awarded to ARS, or any other like determinations were arbitrary and capricious.

Although plaintiff attempts to show that Mr. Keegan's alleged bias violated the Competition in Contracting Act, and that his sexual relations with a GEGS employee violated internal regulations, for reasons stated in Part C below, the plaintiff has not established that the procurement procedure in this case involved a clear and prejudicial violation of applicable statutes or regulations.

#### B. Review of the Contract Award Under the Competition in Contracting Act

■ The Competition in Contracting Act mandates that contract procurements be conducted through full and open competition. 10 U.S.C. § 2304(a)(1)(A). Consequently, at least one court has held that a bidder for a government contract has a "basic right to be treated fairly in the contracting process." *Dynalectron Corp. v. United States,* 659 F.Supp. 64, 69 (D.D.C.1987). For a disappointed bidder to succeed on a claim that it was denied fair

treatment because of bias, however, the bidder must establish the existence of bias by "well-nigh irrefragable proof." *Howard Cooper Corp. v. United States*, 763 F.Supp. 829, 841 (E.D.Va.1991). *See also Starr v. FAA*, 589 F.2d 307, 315 (7th Cir. 1978). Additionally, even if a claimant establishes that a decisionmaker is biased to some degree, the contract award must be upheld if apart from considerations of partiality, "it represents a reasoned resolution of the material issues." *Conax Florida Corp. v. United States*, 641 F.Supp. 408 (D.D.C.1986) (citing *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1209 (D.C.Cir.1981), *aff'd*, 824 F.2d 1124).

■ The plaintiff clearly has failed to establish with "well-nigh irrefragable proof" that the contract procurement at issue was tainted by bias. In fact, plaintiff has not persuaded the Court that Mr. Keegan held to any degree any bias against GEGS. Based on the record provided the Court and the evidence presented at the hearing, the Court is convinced that even had Mr. Keegan been, in some wise, biased against GEGS, his bias did not prejudice GEGS or otherwise infect the ultimate contract decision.

The only credible proof plaintiff offered to support its charge of bias is the prior-noted testimony that Mr. Keegan thrice stated a belief that GEGS had held the AUTEC contract for too long, and other testimony that Mr. Keegan offered to help individuals continue employment at AUTEC. Although the Court accepts the testimony that Mr. Keegan had expressed that he thought GEGS had the contract too long, those expressions must be viewed in the context of their setting, and no nexus has been established between any possible bias and his recommendation that ARS receive the contract. The first time Mr. Keegan is alleged to have stated that GEGS had the contract too long was made to Cheri Works at a bar in July, 1990, almost nine months before initial bids were submitted for the new contract and more than one year before Mr. Keegan made his final determination for purposes of the procurement. The next time Mr. Keegan made

such a statement was more than three months before the initial bids were submitted and was made in response to Ms. Carlson's heated and profane rebuke, when both were drinking and for which actions *both* promptly apologized. As for Mr. Keegan's offers to assist or assure continued employment with the new contract, it was well recognized by the prospective employees that a high percentage (approximately ninety-three percent) of GEGS's workforce would likely be hired by ARS. These prospective ARS employees were further advised that their applications/resumes and interviews would be required. The Court is not persuaded that such discussion of employment establishes any bias against GEGS or any favoritism towards ARS.

At bottom, even if the Court were to find that Mr. Keegan was biased against GEGS and that such bias influenced his decision (neither of which this Court can find), there is nothing to reflect that the ultimate decision to award the contract to ARS was infected by bias. The SSAC, the Contracting Officer, the Commanding Officer, and the NAVSUP Competition Advocate, the ultimate decisionmaker, independently concluded that ARS's proposal provided the best value to the government. There is no proof that those actors were improperly influenced by Mr. Keegan, that they themselves held any bias against GEGS, or that they followed improper procedures in reaching their conclusions.

As a final matter, the Court rejects plaintiff's argument that under *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33 (1989), Mr. Keegan's bias and resulting prejudice against GEGS may be established *ipso facto* by proving merely that Mr. Keegan violated an internal Navy regulation designed to avoid the appearance of impropriety. In *TRW Environmental*, the United States Claims Court held that when a disappointed bidder can establish that a government employee involved in a contract procurement violated a "distinctly focused conflict of interest statute" which expressed an extremely strong Congressional intent to prevent former private sector employees from improperly influencing bid decisions, the disappointed bidder need

not jump the "high hurdle" of establishing that it was prejudiced by the bias of that government employee. *TRW Environmental* at 65. The regulation which Mr. Keegan is alleged to have violated by having sexual relations with a GEGS employee is not as focused as the "revolving door" statute involved in *TRW Environmental* and was implemented to avoid the appearance of impropriety. The holding of *TRW Environmental* is inapplicable to this case and bias and prejudice here cannot, and will not, be so easily assumed. *See TRW, Inc.*, GSBCA No. 11309-P, August 29, 1991, 92-1 BCA ¶ 24,389, 1991 WL 175673 (1991).

## IV. CONCLUSION

For the reasons stated above, judgment will be entered on the accompanying Judgment page in favor of defendants United States of America, H. Lawrence Garrett, Secretary of the Navy, and Paul Brothers, Contracting Officer, in favor of intervenor-defendant AUTEC Range Services, and against plaintiff GE Government Services, Inc.

In the event that an appeal of this decision is taken, for the reasons upon which the decision is based, no stay shall be granted.

IT IS SO ORDERED.