UNION TEXAS PETROLEUM CORPO-
RATION; Mobil Oil Corporation, and
Citation Oil and Gas Company, Appel-
lants,

v.

Ben JACKSON, Conservation Attorney,
Oklahoma Corporation Commission,
City of Cyril, Oklahoma, and American
Exploration Company, Appellees.

Nos. 80,972, 80,976, and 80,959.

Court of Appeals of Oklahoma,
Division I.

April 25, 1995.

Rehearings Denied June 2, 1995.

Certiorari Denied Dec. 4, 1995.

Verland E. Behrens, George E. Sneed, Oklahoma City, for Appellant Citation Oil & Gas Co.,

Gary W. Davis, James W. George, Stephen L. Degiusti, Oklahoma City, for Appellant Mobil Oil Corporation,

Kenneth N. McKinney, Robin F. Fields, Connie M. MacWatters, Oklahoma City, for Appellant Union Texas Petroleum Energy Corporation,

Michael J. Hunter, Leslie Wilson Pepper, Lu Willis, Oklahoma City, for Appellee Oklahoma Corporation Commission,

Doyle G. Bunch, Kenneth H. Blakley, Oklahoma City, for Appellee American Exploration Company.

### OPINION

HANSEN, Presiding Judge:

The Conservation Attorney for the Oklahoma Corporation Commission (Commission) filed this Application in the Corporation Commission on March 23, 1990.[1] The Amended Application named Appellants Citation Oil & Gas Corporation (Citation), Mobil Oil Corporation (Mobil), and Raymond Punneo, Mayor of the City of Cyril as Respondents. Appellant Union Texas Petroleum Corporation (Union), also described as UTP by the Commission, and American Exploration Company (American), also described as AEC by Commission, were allowed to intervene. Union intervened because it owned a working interest in the land covered by the Application until 1986.[2] American intervened as Union's successors in interest. In the Application, the Conservation Attorney requested an investigation and order from Commission regarding the extent, if any, of the source or continued contribution of alleged saltwater contamination of the subsurface waters which constitute the town of Cyril's municipal water supply.

In 1960 Union acquired a leasehold interest in the Cement I unit (CIU) from Anderson–Prichard Oil Corporation. The CIU is larger than the Application area. Union operated producing wells and a saltwater disposal well in the CIU from 1960 to 1970. In 1986, Union sold its interests in the CIU to American. In 1970 the involved lands were unitized under 52 O.S.1991, § 287.1 et seq. to conduct secondary recovery operations. Mobil was a successor in interest to Magnolia Petroleum Co., which was an operator in the area. By March, 1973, Mobil owned a 51.52% interest in the CIU. The Commission determined Mobil was the largest pre–CIU owner/operator in the Application Area. Mobil was the Unit Operator of each of two secondary recovery waterflood units until 1989 when it sold its interests in the two units, the West Cement Unit and the CIU, to Citation.

The ALJ determined the contaminated zone of subsurface water included both the Rush Springs aquifer and the Marlow aquifer. The Application alleged the sources of pollution appeared to be wells and pits located in the two secondary recovery projects. Oil and gas production operations are the only source of saltwater in the area. The Conservation Attorney sought an order identifying the sources of contamination and the responsible parties. He asked the Commission to approve a plan of abatement of the pollution.

Commission chose to bifurcate the hearing. Phase I would cover the extent the aquifer was contaminated, the sources of the contamination, and who would be responsible for conducting an investigation into the remediability of the contamination. The threshold issue was the jurisdictional power of Commission to order any of the named respondents, at their expense, to conduct the investigation.

1. The Conservation Division of the Corporation Commission is created in 52 O.S.1991, § 149.

2. The Amended Application covered all of Sections 1 and 12 of Township 5 North, Range 9 West and Sections 6 and 7 of Township 5 North, Range 9 West, Caddo County, Oklahoma. For purposes of contribution to contamination from pits, the E/2 of Section 1 and the W/2 of Section 6 were the most relevant.

Phase II would then cover whether the alleged contaminated aquifer should or could feasibly be remediated, and the nature of any such remediation. The exact issues for Phase II would be determined at a prehearing conference conducted at the conclusion of the Phase I proceeding.

An administrative law judge (ALJ) for Commission conducted an evidentiary hearing which lasted 21 days on Phase I.[3] The ALJ determined that no liability or responsibility would be imposed on any of the respondents unless the Applicant proved a violation of a statute relating to Commission's jurisdiction or a violation of a Commission regulation, rule or order, causation and injury. The ALJ made extensive findings of fact.[4] It found that both the Rush Springs aquifer and the Marlow aquifer had been contaminated by chloride from oil and gas operations within the area. He found that assuming all sources of pollution had been cut off, it would take in excess of 50 years for the polluted groundwater to move beyond the area of Cyril's water wells.

The ALJ stated the weight of the evidence showed there was no way to determine what amount of contamination came from any particular source. The three primary sources of contamination were land spreading of produced saltwater, the operation of unlined, saltwater evaporative pits and Mobil's operation of the CIU utilizing excessive injection rates and pressures from 1972 to 1989. It was clear to the ALJ that the pits were primarily responsible for contaminating the municipal water supply during the period from 1948 or earlier, until 1970 or 1971 (pre–CIU). The evidence established that in early 1972, the chloride content within the municipal water supply dramatically increased during Mobil's operations of its injection wells in the CIU.

The evidence showed Anderson Prichard Oil Corporation operated producing wells, used saltwater evaporative pits and conducted land spreading during primary production which caused contamination of the water supply. In 1962, Union Texas purchased leasehold interests of Anderson Prichard and actively operated the leases until Mobil began its unitization operations in 1970. In 1986, Union Texas sold its working interest in the CIU to American Exploration Company (American).

Mobil operated producing wells and utilized saltwater evaporation pits in this area during primary production and became operator of the CIU in 1970. Citation purchased Mobil's interest and became the successor operator of the CIU on August 2, 1989.

The ALJ denied Mobil's motion to dismiss finding Mobil violated statutes, orders, rules and regulations of Commission which has caused the pollution of the water supply. The ALJ recommended Union's Motion to dismiss should also be denied because it violated Commission's rules, regulations, order and statutes which cause and contributed to contamination of the aquifer. The ALJ recommended granting Citation's motion to dismiss and also American's motion to dismiss, finding neither could be held liable for the pollution. The ALJ recommended the responsible parties' liability be joint and several and the costs of the investigation should be borne equally between Mobil and Union. This was based on his determination the proportionate amount of contribution to contamination from the different sources could not be determined. The ALJ recommended that an interim order issue requiring further investigation of the hydrologic unit to decide whether remediation was feasible.

Commission adopted the findings and recommendations of the ALJ except as modified in Order No. 372735.[5] Commission denied

3. The Corporation Commission, when exercising its adjudicative authority, is the functional analogue of a court of record with dispute resolution authority conferred by Constitutional grant. *Van Horn Oil Company v. Oklahoma Corporation Commission*, 753 P.2d 1359 (Okla.1988). The Commission may delegate the power to hear evidence to hearing officers whose only authority is to receive evidence and make recommenda-

tions to the Commission. *Van Horn Oil Company*, at 1363.

4. Attached to Commission's Order No. 372735 was a 75–page summary of the evidence.

5. Order No. 372735 was subsequently modified by Commission Order No. 373627. Order No. 372735 reflects the Commission's decisions on

Union's appeal to the initial report of the ALJ but contrary to the ALJ's recommendation, it found Citation, as a successor in interest who has actively operated the CIU, was responsible for the actions of its predecessors in interest. It ordered that the costs of the investigative plan required by Order No. 372735 should be borne equally among Mobil, Union and Citation. It found the liability of current parties of record should not be re-litigated during Phase II.

Before this Court is the City of Cyril's motion to withdraw from this appeal. The Mayor of Cyril was named as a Respondent in the Application before the Commission. Cyril has not appealed or cross-appealed the Commission's order but filed answers to Appellants' briefs. While proceedings were in progress before the Corporation Commission, Cyril filed an action in the District Court for the Western District of Oklahoma for damages for the loss of its water supply system against Mobil, Union and Citation. That action has been settled. The Commission's Order held Cyril was not liable for any costs in connection with the investigation so ordered. Cyril has withdrawn from the cause before the Commission. Cyril's motion to withdraw from this appeal is granted and this appeal will proceed.

### STANDARD OF REVIEW

The third clause of Article 9, § 20 of the Oklahoma Constitution provides:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving [i]n asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has

regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from.

 This Court will only determine constitutional questions if necessary to adjudicate the rights of the parties. *Ranola Oil Company v. Corporation Commission of Oklahoma,* 752 P.2d 1116, 1118 (Okla.1988). This provision of the Constitution requires us, in cases not involving constitutional issues, to utilize a "substantial evidence" test for reviewing decisions of the Commission. *El Paso Natural Gas v. Corporation Commission,* 640 P.2d 1336 (Okla.1981). The determination of whether substantial evidences exists does not require that the evidence be weighed, only that there be evidence tending to support such order, i.e. the proof must be "more than mere scintilla". *MCI Telecommunications Corp. v. State,* 823 P.2d 351 (Okla.1991); *El Paso,* at 1338. The "substantiality" of the evidence must take into account whatever in the record fairly detracts from its weight. *Id.* Searching a record for substantial evidence "does not entail a comparison of the parties' evidence to determine that which is most convincing but only that the evidence supportive of the order be considered to determine whether it implies a quality of proof inducing a conviction that the evidence furnished a substantial basis of facts from which the issue could be reasonably resolved." *Union Texas Petroleum v. Corporation Commission,* 651 P.2d 652, 662 (Okla.1981). The Corporation Commission's findings are presumed correct in matters it frequently adjudicates and in which it possesses expertise. *MCI,* at 358.

### CITATION'S APPEAL

 The first issue to address is Citation's challenge to the Corporation Commission's jurisdiction.[6] Citation contends the only

---

all issues of law and fact but was clarified and amended to show Commissioner Graves' voluntary recusal and that the part of Order No. 372735 which required Mobil, UTP and Citation to pay the costs associated with the execution of

the plan, including fees for consultants, meant *reasonable* fees for consultants.

6. Citation filed its Application to Assume Original Jurisdiction and Petition for Writ of Prohibi-

proper jurisdiction lies in district court because this is an action to abate a public nuisance. Commission Order No. 372735 cites 17 O.S.1991, § 52, 52 O.S.1991, § 139 et seq. and 63 O.S.Supp.1992, § 1–2005 as the basis of its subject matter jurisdiction.

■ The Corporation Commission is a tribunal of limited jurisdiction and has only such jurisdiction and authority as is expressly or by necessary implication conferred upon it by the Constitution and statutes. *Merritt v. Corporation Commission,* 438 P.2d 495 (Okla.1968). If our Constitution and statutes do not confer jurisdiction upon the Commission either expressly or by necessary implication, the Commission's order is void. *Merritt,* at 497.

The Commission has the jurisdiction, power and authority to make and enforce rules, regulations and orders governing and regulating the handling, storage and disposal of salt water for the purpose of preventing pollution of surface and subsurface waters of this state. 52 O.S.1991, § 139 [7]; *Merritt,* at 498. In a provision of the Oklahoma Controlled Industrial Waste Disposal Act, 63 O.S. 1991, § 1–2001 et seq., the Corporation Commission is granted the *exclusive* jurisdiction, power and authority and indeed the duty to make *and enforce* rules, regulations and orders governing and regulating the handling, hauling, storage and disposition of salt water, mineral brines, waste oil and other deleterious substances produced from or obtained or used in connection with the drilling, development, producing and processing of oil and gas. 63 O.S.1991, § 1–2005(A)(2) [8]. This Section further provides the Commission shall promulgate such rules and regulations as are "reasonable and necessary for the purpose of preventing the pollution of the surface and subsurface waters in the state".[9]

Commission determined the chloride contamination of Cyril's water supply came from oil and gas operations in violation of the

---

tion in appeal no. 80959 which was recast by the Oklahoma Supreme Court as an appeal from Corporation Commission Order No. 372735 and consolidated with appeal no. 80976 into surviving appeal no. 80972.

7. Section 139 was extensively amended by the Legislature in 1993 and now provides the Corporation Commission is vested with *exclusive jurisdiction,* power and authority and shall have the duty to make and enforce rules and orders governing and regulating the handling, storage and disposition of saltwater, mineral brines, waste oil and other deleterious substances produced from or obtained or used in connection with the drilling, development, producing, and operating of oil and gas wells and brine wells in this state. Subsection (B)(2) now provides: "The exclusive jurisdiction, power, and authority of the Corporation Commission shall also extend to the construction, operation, maintenance, *site remediation,* closure and abandonment of the facilities and activities described in paragraph 1 of this subsection."

8. 63 O.S.1991, § 1–2005 was repealed effective July 1, 1993, by Section 362, Ch. 145, O.S.L. 1993. The legislature enacted, effective July 1, 1993, the Oklahoma Environmental Quality Code, in 27A O.S.Supp.1994, § 2–1–101 et seq.

9. The parties have argued the applicability of 29 O.S.1991, § 7–401, which was not cited in the Order. At the time this action was filed, that section provided in part:

A. Except as otherwise provided, no person may deposit, place, throw, or permit to be deposited, placed or thrown, any lime, dynamite or other explosive, poison, drug, sawdust, *saltwater,* crude oil or any other deleterious, noxious or toxic substance in any *stream, lake or pond* of this state, or in any place where such substances may run or be washed into such waters.

\* \* \* \* \* \*

C. Any person, firm or corporation violating the provisions of this section shall be punished by a fine of not less than One Hundred Dollars ($100.00) nor more than Five Hundred Dollars ($500.00), and each day or part of day during which such action is continued or repeated shall be a separate offense. Provided, that the party responsible for the control of any salt water, crude oil or other deleterious substances causing a violation of this section and resulting from drilling, production, transmission, storage or other operation of the petroleum industry shall be reported to the Oklahoma Corporation Commission and if corrective action is not taken immediately then criminal proceedings shall be had as herein provided. *The Corporation Commission is also given the express power to order whatever corrective action is necessary to abate the pollution and is given the authority to enforce the order by any action against the lease or well.* Such action shall be reported by the Wildlife Department to the appropriate agency.

The 1991 version does not appear to apply specifically to underground aquifers. Section 7–302 was amended in 1993 by deleting the language "any stream, lake or pond" and inserting in lieu thereof "any waters of this state".

Commission's rules. Commission determined Mobil, Union and Citation violated Commission rules. Commission held Citation violated Rule 3–103, now OAC 165:10–7–5. Citation contends however, that because Commission determined the CIU operations were eliminated by Citation as an *active* source of contamination and that ancient pits were not a threat, that there is no pollution left to "prevent" and therefore, the Commission has no jurisdiction. The Commission's order shows that Citation, as the current operator of the CIU, has taken positive steps to prevent further pollution. However, the "Plume of Contamination" which was caused by the oil and gas operations continues to be "an instrumentality of further pollution as well as an example of contamination". The Plume will continue contaminating pristine down-gradient tracts in its path. Even though there is no "active" source of *further* additions to the existing contamination, the initial contamination continues to spread pollution in its wake.[10]

Under the above-mentioned statutes, as they existed prior to 1993 amendments, Commission is charged with preventing pollution of subsurface waters by oil and gas operations. Under these statutes, we hold Commission's jurisdiction, including the authority to provide for remediation if it determines such is feasible in Phase II, is proper; provided Commission finds the parties to be charged with remediation, including the

Phase II investigation costs, violated a Commission rule or regulation.[11] Although the district court does have jurisdiction to hear the town of Cyril's damages action for nuisance, this does not prevent the Corporation Commission from proceeding to abate the existing contamination.[12]

■ The balance of Citation's appeal is that the order of Commission, which requires it to bear with Mobil and Union, the costs associated with determining the extent of contamination and the feasibility of aquifer clean-up (Phase I), is not supported by the law or the evidence. Specifically, Citation contends Commission erred in determining Citation was liable for these costs because the ALJ's finding, adopted by Commission, shows Citation's operations did not *cause* any pollution. Commission maintains Citation is liable because it currently operates the unit and violated Corporation Commission Rule 165:10–7–5.[13]

The ALJ determined, among other things in his Conclusions of Law in his Report, that the doctrine of nuisance may not be applied in Commission proceedings to find the respondents liable. The ALJ also held the doctrine of negligence is not applicable to this Commission proceeding. The ALJ stated the proceeding is more akin to a contempt proceeding because the applicant, here the Conservation Attorney of the Commission, predicates relief upon a violation of a Commission rule or regulation.[14] In Conclusion

---

10. See *Branch v. Mobil Oil Corporation*, 788 F.Supp. 531 (W.D.Okla.1991), where evidence of old saltwater pollution which *continued to migrate* and contaminate underground water was sufficient to create a genuine issue of fact as to whether the defendant participated in the creation or maintenance of a nuisance.

11. See *Matador Pipelines, Inc. v. Oklahoma Water Resources Board*, 742 P.2d 15 (Okla.1987); *State ex rel. Pollution Control Coordinating Board v. Oklahoma Corporation Commission*, 660 P.2d 1042 (Okla.1983).

12. See *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373 (10th Cir.1989) (Although Corporation Commission has authority to order remedial action, that authority does not prevent district courts from awarding *damages* for cleanup); *Greyhound Leasing & Financial Corporation v. Joiner City Unit*, 444 F.2d 439 (10th Cir.1971) (Under Oklahoma law, owners of oil and gas lease interests may sue for damages for en-

croachment of saltwater by secondary recovery operations on the theory of private nuisance).

13. Rule 165:10–7–5 provides:
a. General. Pollution is prohibited. All operators, contractors, drillers, service companies, pit operators, transporters, or other persons shall at all times conduct their operations in a manner that will not cause pollution. Rule 165:10–1–2 defines "pollution" as the contamination of freshwater, either surface or subsurface, by saltwater, mineral brines, waste oil, oil, gas, and other deleterious substances produced from or obtained or used in connection with the drilling, development, producing, refining, transporting or processing of oil or gas within the State of Oklahoma.

14. The ALJ cited *Stamford Energy Companies, Inc. v. The Corporation Commission of the State of Oklahoma*, 764 P.2d 880 (Okla.1988); *Vogel v. Corporation Commission of Oklahoma*, 190 Okla. 156, 121 P.2d 586 (1942).

of Law No. 8, the ALJ found Citation's motion to dismiss should be granted because:

> [t]he weight of the evidence does not show that Citation has violated any statute, order, rule or regulation of the Commission in the conduct of its operations since August 2, 1989. There is no evidence showing that Citation's operations of the Cement I Unit caused any contamination of the aquifer. While there was a purge in the Darlington No. 2 well subsequent to Citation assuming operations, the ALJ finds the weight of the evidence does not establish that Unit operations were the cause of that purge.

Under Conclusion of Law No. 14, the ALJ discussed the basis of liability of the parties, concluding that a successor in interest who has actively operated the leasehold interest can be held liable or responsible for the actions of a predecessor in interest to the leasehold where the *predecessor's* actions resulted in a violation of a statute relating to Commission's jurisdiction or a violation of a Commission rule, regulation or order, which violation caused contamination to or contributed to contamination of the surface or subsurface waters. The ALJ based this legal conclusion on a "longstanding policy or rule" of the Commission under which liability is imposed upon active, successor operators to cure past pollution or past plugging problems caused by a predecessor in interest[15]. The ALJ opined this Commission policy is consistent with nuisance law in 50 O.S.1991, § 5.[16]

Commission Order No. 372735, which adopted many of the ALJ's findings and recommendations, provided liability for pollution would be assessed for two reasons: first, because pollution of the treatable water zones within the Application Area resulted from violations of Commission rules which prohibit pollution and require operators to maintain pollution-free facilities; and second, liability may be imposed upon the purchaser of contaminated property where a) the buyer takes over oil and gas operations and b) a violation of a Commission rule is occurring *after the sale.* Thus, liability is predicated in both instances on the existence of a rule violation.[17]

As noted above, the Corporation Commission has the jurisdiction, power and authority to make and enforce rules, regulations and orders governing and regulating the handling, storage and disposal of saltwater for the purpose of preventing pollution of subsurface waters in this state. *Merritt v. Corporation Commission,* 438 P.2d 495 (Okla.1968); *Matador Pipelines, Inc. v. Oklahoma Water Resources Board,* 742 P.2d 15 (Okla.1987); *State ex rel. Pollution Control Coordinating Board v. Oklahoma Corporation Commission,* 660 P.2d 1042 (Okla. 1983); *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373 (10th Cir.1989). The proper forum for a landowner to recover damages for nuisance caused by encroaching saltwater is in district court. *Greyhound Leasing & Financial Corp. v. Joiner City Unit,* 444 F.2d 439 (10th Cir.1971); *Harper–Turner Oil Company v. Bridge,* 311 P.2d 947 (Okla.

---

**15.** The ALJ also mentioned the existence of "unpublished Supreme Court cases" from the 1960's in which the Commission held active successor operators liable. However, the ALJ states, the Supreme Court only affirmed the Commission's actions without specifically addressing the liability issue. The ALJ stated the Commission's policy was validated by *Loriaux v. Corporation Commission,* 514 P.2d 941 (Okla.1973) and *Amax Petroleum Corp. v. Corporation Commission,* 552 P.2d 387 (Okla.1976). The ALJ also compared this Commission policy to policy considerations in the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), which imposes strict liability. The ALJ opined the Commission's policy is an attempt to "resolve the funding problem for cleanup through the imposition of what may be called, in a sense, 'strict liability' ". The ALJ opined that if Oklahoma and the Commission wanted to retain

the EPA's approval of state regulation of oil and gas affairs, the Commission should not be less stringent than CERCLA standards.

**16.** 50 O.S.1991, § 5 provides:

> Every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it.

**17.** This is different from the ALJ's statement that liability could be imposed on a purchaser of the leasehold for a predecessor-in-interest's violations. The Commission thus, impliedly, declined to adopt the ALJ's reasoning regarding the imposition of liability on a party who has not himself, violated a rule.

1957).[18] This is not inconsistent with our holding that Commission may proceed to abate such "nuisance", including assessment of liability therefore, in accordance with this State's statutes and court decisions, including the law of nuisance in order to enforce compliance with its rules and regulations duly promulgated to effectuate its statutory duties. The Corporation Commission cannot arbitrarily, as the ALJ suggests, impose strict liability on an entity for the investigation costs and/or remediation costs of saltwater contamination without a basis for same in the law.

A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others or in any way renders other persons insecure in life or in the use of property. 50 O.S.1991, § 1; *Cities Service Oil Company v. Merritt*, 332 P.2d 677, 684 (Okla.1958). In *Cities Service*, the Supreme Court determined the basis of liability for injury or damage to property by pollution of subterraneous waters, from oil, gas or saltwater from oil wells, must be either negligence or nuisance. *Cities Service*, at 684. Cities or towns may seek abatement of a public nuisance, including protection of public water supplies, within their respective corporate limits in district court. 50 O.S.1991, §§ 16, 17.[19] A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. 50 O.S.1991, § 2; *Miller v. State*, 74 Okla.Crim. 104, 123 P.2d 699 (Okla. Crim.App.1942). The remedies for public nuisance are through indictment or information, civil action, or abatement. 50 O.S.1991,

§ 8. A public nuisance may be abated by *any public body or officer authorized thereto by law.* 50 O.S.1991, § 11.

Section 5 of Title 50 of the Oklahoma Statutes provides:

> Every successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by a former owner, is liable therefor in the same manner as the one who first created it.

This Section provides for liability of successor owners or lessees if the owner or lessee has or should have knowledge of the existence of the nuisance and of its liability to cause injury.[20] In *Daniels v. St. Louis & S.F.R. Co.*, 36 Okla. 421, 128 P. 1089 (1912) Defendant's predecessor built a road across land outside of its right of way and a bog was created. Defendant bought the road. Plaintiff's horses got bogged down in the bog and died. Plaintiff sued Defendant for nuisance. The Court held Defendant had no notice of the nuisance and did not use it. The Court stated the rule that where real estate is bought after a nuisance on it is created, the purchaser is not liable for damages occasioned by the nuisance until his attention has been called to it and he has been asked to abate it. The rule is different where the purchaser uses or repairs the nuisance. If he uses or repairs it, he would become an active participant in the wrong. There must be more than an omission to abate or remove the nuisance, something amounting to actual use. In *Chicago, R.I. & P. Ry. Co. v. Morton*, 57 Okla. 711, 157 P. 917 (1916), the Court determined that a lessee who had actual *or constructive* knowledge of a nuisance on its leased premises created by another, may be liable for the maintenance thereof.

---

**18.** The district courts, not the Corporation Commission, have the jurisdiction to provide a plaintiff with a remedy, including damages, for injury from oil and gas saltwater contamination. *Greyhound Leasing & Financial Corp. v. Joiner City Unit*, 444 F.2d 439 (10th Cir.1971); *Commercial Drilling Co. v. Kennedy*, 172 Okla. 475, 45 P.2d 534 (1935); *Tidal Oil Co. v. Pease*, 153 Okla. 137, 5 P.2d 389 (1931); *MM Resources, Inc. v. A.L. Huston*, 710 P.2d 763 (Okla.1985). Saltwater contamination from oil and gas operations occurring from violations of Commission rules are referred to as nuisances. *Texaco, Inc. v. Berry*

*Petroleum Corporation*, 869 F.Supp. 1523 (W.D.Okla.1994).

**19.** As noted previously, the town of Cyril's action for damages for the loss of its water supply has been settled.

**20.** The Commission's Order specifically provides Union should have known of the disposal problems created by its predecessor and other operators on its leases.

All Appellants raise on appeal the issue of their and the others' liability as operators of the CIU. With regard to *Citation's* liability as current operator of the CIU, Commission disagreed with the ALJ's recommendation to grant Citation's motion to dismiss, and stated:

> The recommendation is premised on a finding that Citation did not cause pollution through a violation of an order or rule of the Commission. *However, the Commission finds that Citation did violate the prohibition against pollution in OCC–OGR Rule 3–101, now OAC 165:10–7–5. Citation assumed operations over the CIU, which had ongoing pollution.*

> The [ALJ] confuses Citation's "good behavior" with the fundamental liability problem. Citation took over operations without examining Mobil's well files. Upon taking over the unit, Citation was confronted by the Conservation Division with the ground water pollution problem. In response, Citation took positive steps to prevent further loss of injectate to treatable water bearing zones. It limited its injection rates and pressures. It ran casing inspection logs to determine the condition of casing in wells. It installed risers to monitor any pressure on the surface casing-production casing annuli of wells. It commenced a repair and plugging program for wells, which had been shut-in by Mobil. *However, Citation has never taken steps to either remove contaminants or arrest their down-gradient movement.*

> One of the major points which the Administrative Law Judge failed to recognize is that the Plume of Contamination is an instrumentality of further pollution as well as an example of contamination. The plume consists of concentrated chlorides, which are moving down-gradient. By nature, those chlorides move as a mass or slug. Dilution occurs only on the plume's edges through dispersion, and the plume leaves some contaminant residues in its wake. As a result, the plume is an ongoing source of concentrated chlorides from injectate and leachate, contaminating pris-

tine down-gradient tracts in its path. In that regard, the leading edge of the plume has already moved outside of the CIU boundary as the plume moves to the southwest.

Thus, Commission determined Citation was jointly and severally liable with Mobil and Union for the costs of the investigation and study required by the order in Phase I in that it violated Rule 165:10–7–5 because it had "never taken steps to either remove contaminants or arrest their down-gradient movement". Rule 165:10–7–5 prohibits all operators from conducting their operations in a manner that "causes pollution". The question then, is whether there is substantial evidence that Citation conducted its operations in a manner which caused pollution; i.e. whether it maintained the "nuisance" of other prior operators.

The ALJ found that Citation did not violate any statute, order, rule or regulation of the Commission in the conduct of its operations which began on August 2, 1989. The ALJ stated there was no evidence that Citation's operations of the CIU caused any contamination of the aquifer. While there was a purge in one well during Citation's operations, the ALJ determined the weight of the evidence did not establish that Unit operations were the cause of the purge. These findings by the ALJ were *not modified by Order No. 372735.* However, Commission determined Citation "caused pollution" (violated the Rule) because it failed to "remove contaminants or arrest their down-gradient movement", i.e. because Citation failed to do something about the moving "plume of contamination". Thus, Citation's liability is predicated on an omission to do something. Implicit in such finding is the attendant finding that the thing that should have been done, could have been done (removing the chlorides or arresting their movement). The feasibility/possibility of remediating the contaminated water zones is *the* issue to be determined in Phase II which is *based on the study conducted pursuant to the Order now appealed.*[21] Our careful review of the evi-

---

21. In Order No. 372735, Commission stated "it remains to be determined whether the contami-

nated treatable water zones can be remediated. Absent cleanup by the Respondent oil companies,

dence indicates there is not substantial evidence to support the Commission's finding *at this stage,* that Citation violated Rule 165:10–7–5 by "causing pollution" such as to make Citation liable for the costs associated with execution of the plan which is required by Order No. 372735. Although Citation operated the CIU, this alone is insufficient to impose liability on it *at this point* because there is no evidence it "caused" pollution and violated Rule 165:10–7–5.

Although Commission provided in its order that "the liability of current parties of record shall not be re-litigated during the second phase of the cause", we hold that if the evidence presented during Phase II discloses that Citation, during its operations of the CIU violated Rule 165:10–7–5 by "causing pollution" because it could have and should have "removed the contaminants or arrested their down-gradient movement", then Citation's liability as a successor operator of the CIU may be litigated at that time. Because there is no evidence at this point supporting the Commission's determination Citation violated Rule 165:10–7–5, that is, no determination that Citation caused pollution in the Area, Citation should have been dismissed *from Phase I* and is not jointly and severally liable for the costs of the study required by Order No. 372735. Joinder of *Citation* in Phase II should therefore be allowed.[22] To this extent only, Order No. 372735 is modified.

### MOBIL'S APPEAL

The following are Mobil's general propositions of error regarding Corporation Commission Order No. 372735:

1. error in ruling that new parties cannot be joined and that liability for remediation cannot be litigated in Phase II;

2. errors in factual determinations regarding extent of contamination during

both primary and secondary recovery operations, that Mobil contributed the pre-CIU contamination and that CIU operations caused Cyril's water supply to become polluted;

3. error in including the Duncan Formation in Order;

4. error in failing to find CIU working interest owners, including AEC, jointly and severally liable; and

5. error in failing to find Union responsible for all contamination caused by Apco and failing to hold AEC responsible for contamination from abandoned Apco saltwater pits.

■ Mobil maintains Commission erred in holding new parties may not be joined in Phase II because such determination violates the Prehearing Conference Agreement upon which Mobil relied and is contrary to the evidence that there are other parties responsible for the pollution. The Prehearing Conference Agreement (the Agreement) listed six issues to be determined in Phase I. Among them were whether the sources of the contamination could be identified with available data, and if they could, what are the sources of the contamination and how was it caused. Phase II issues included whether the aquifer could be remediated, the nature of the remediation, and the parties responsible for remediation.

The Commission, in Order No. 372735, addressed Mobil's contention, and stated that the Agreement expressly provides for a determination of who caused the pollution and that this does not conflict with the provision for a Phase II determination of who will do the site remediation. The Order also provides the finding of liability for pollution is a foundation for determining who should bear the costs of the feasibility study required in Phase I, which is predicated upon Commission's jurisdiction to require polluters to

50 years will be necessary for the Plume of Contamination to move beyond the areas of influence of Cyril's southernmost wells. To determined the feasibility of clean-up by other means, experts on both sides of the cause agreed that further testing is needed: said testing to include but not be limited to the drilling of additional monitoring wells, wireline surveys, water sampling and laboratory analysis, water level mea-

surements, production testing, sustained production and plume modeling."

22. Both Mobil and Union argue the propriety of the Commission's Order which denied the parties the right to join *new* parties in Phase II. This issue will be addressed in the disposition of Mobil's appeal.

clean up. Commission held there was no basis to join any new party or relitigate any of the issues adjudicated by the Order, noting that the Application was based on extensive pre-trial discovery and that Respondents had more than ample time to prepare their defenses. The Commission concluded there was "insufficient evidence of any contribution to pollution by any extant entity who is not a party of record."

The record indicates Mobil elected to rest even after the ALJ directed the parties to continue to put on their evidence regarding contaminant sources. The requirement that the parties put on evidence in Phase I regarding sources and responsibility for contamination does not conflict with the parties' agreement to determine who are the parties responsible for any remediation in Phase II. Because causation of pollution directly relates to liability for any remediation, we cannot say Commission erred in refusing to allow the parties to "relitigate" liability in Phase II. Furthermore, Mobil has failed to show it has suffered prejudice. All parties were given an opportunity to present evidence on the issues of causation and sources of pollution after extensive discovery. The Commission's determination that there was insufficient evidence of contribution to Cyril's pollution by any other entities, for purposes of joinder of parties, is supported by substantial evidence. This assignment of error is overruled.

Mobil next challenges the Commission's factual determinations regarding the extent of contamination during both primary and secondary recovery operations, that Mobil contributed to pre-CIU contamination and that its CIU operations caused Cyril's water supply to become polluted. Mobil attacks the evidentiary material, including the expert testimony which supports the Commission's determination that approximately 300,000 barrels of highly saline saltwater were placed into unlined saltwater evaporation pits during primary production. Mobil believes the evidence indicates the amount of *pre-CIU* contamination is much more. Mobil also contends Commission erred in finding it contributed to pre-CIU contamination because there

is no evidence saltwater pits existed during primary production on Mobil leases.

We reiterate our standard of review for non-constitutional factual issues: whether the Commission's findings are supported by substantial evidence. *MCI Telecommunications Corp. v. State,* 823 P.2d 351 (Okla.1991). This standard does not require this Court to weigh the evidence but only to examine the totality of the record for proof "more than mere scintilla". *Id.,* at 358.

Commission made extensive findings regarding the chloride concentrations of the Cyril wells. Commission determined, based on a saltwater production curve and records of disposal practices, that land spreading contributed approximately 8,000 barrels, while approximately 300,000 barrels were available to be placed into unlined saltwater evaporation pits. These volumes represent the cumulative volumes by all operators for all wells in the Application Area. The ALJ found these volumes are based on "scanty data" but are the best estimates. Our review of the summary of evidence shows substantial evidence from which Commission could base such findings. Commission adopted the ALJ's finding that there is no way to attribute the amount of contamination from any particular source and held there was no reasonable basis for determining the percentage of contamination caused by Mobil alone. Even if Commission determined more than 300,000 barrels of saltwater contaminated the water supply during primary production, this would not negate the fact that Mobil contributed to the pre-CIU contamination.

Commission determined there were five main sources of contamination to the Upper Rush Springs Aquifer: land spreading of produced saltwater, the operation of saltwater evaporative pits which were unlined and allowed leaching, surface spills in conjunction with Union's pre-CIU operations, 29 surface spills from Mobil's corroded, high pressure saltwater lines during CIU injection, and seepage from Mobil's unlined work-over pits used during Mobil's CIU operations. With regard to the evaporative pits, the ALJ determined the pits were primarily responsible for contaminating the water supply from 1948 to 1970 or 1971 (pre-CIU) but they

should now be considered historic sources of contamination. Ownership and use of pits was primarily gleaned from aerial photographs taken between 1940 and 1974. There are no official records on disposal volumes from pits, nor are there permits for pits or reports on pit usage. There was evidence that certain pits in the photographs could be considered evaporative pits because of their size. A retired Union pumper testified he was aware of only two operators who had saltwater pits between 1958 and 1970: Mobil and a company called Norman & Graham.[23] Based on earlier testimony that Mobil acquired the Norman and Graham interests, the Commission held Mobil did indeed operate leases with salt water evaporation pits and later acquired other leases with such pits. Ownership of the other pits could not be determined. Mobil admits in its brief that it did operate two leases with pits but maintains these leases could not have contributed to the pollution. Commission concluded the contribution of any single disposal pit to the contamination could not be determined.

Commission's determination that Mobil contributed to pre-CIU pollution because it operated two leases with pits between 1940 and 1962 and because it operated 51% of the CIU acreage which contained saltwater evaporation pits, is supported by substantial evidence. This Court will not weigh conflicting evidence to determine its preponderance. *Delaney v. Osborn*, 265 P.2d 481 (Okla.1953). This is a function of the Commission.

▮ Mobil next attacks the sufficiency of the evidence regarding the Commission's determination its CIU operations contributed to contamination of Cyril's water supply. Mobil conducted its CIU injection operations between September 1, 1971 and August 2, 1989. The operations involved the subsurface injection of approximately 100 million barrels of saltwater. The ALJ found in early 1972, the chloride content within Cyril's water supply "dramatically increased" during Mobil's CIU operations. The Commission determined Mobil's operations contaminated both the Upper Rush Springs Aquifer and

the lower ground water-bearing zones. Liability was predicated on the following violations: a) failure to maintain equipment to prevent surface spills, b) seepage of chlorides from unlined work-over pits into groundwater, c) subsurface injection at rates in excess of those permitted, d) failure to maintain adequate casing and cement in CIU injection and recovery wells, e) escape of injectate from the CIU's authorized injection interval, f) pollution by percolating chlorides and escaping injectate, and g) failure to remediate ground water after 13 of 14 purging well events. Except for surface spill violations, these same violations occurred regarding the lower ground water-bearing zones.

We find it unnecessary to restate the lengthy and detailed evidentiary support for Commission's findings regarding Mobil's CIU operations. Our review of the evidentiary material indicates there is substantial evidence from which Commission could conclude Mobil's secondary recovery operations of the CIU was a contributing cause of the contamination of Cyril's water supply.

▮ Next, Mobil maintains Commission erred in including the Duncan formation in its order. The Order provides:

Turning to the Duncan Sandstone, very little is known about contamination in the Duncan Sandstone. There is only one water well completed in the Duncan Sandstone within the Application Area. Also, there is no production history for that well. The well was seldom produced because of the availability of good yields of higher quality water at more shallow depths. Nevertheless, there is evidence that CIU injectate charged the Duncan Sandstone. In 1972, the WCMU Well No. 29 purged and contaminated the Duncan Sandstone according to Mobil records. After that event, Mobil pumped approximately 14,000 barrels of water from the Duncan Sandstone to reduce chloride levels to 250 ppm. In addition, the Duncan Sandstone was exposed to vertically migrating saltwater during eleven other purging well events.

23. There was other evidence, as the Commission found, that *use* of disposal pits was discontinued in 1952 and that it could not be determined from the photographs after 1952 whether the remaining open pits were active disposal sites.

Mobil maintains Commission, in violation of due process, impermissibly expanded the Application by including the Duncan sandstone in its Order. Mobil argues it had no notice the Commission intended to include the Duncan sandstone in the hearing. Mobil maintains there is no evidence that any Cyril well produced water from the Duncan, but that the Commission found that one water well was completed in the Duncan in the Area. Commission does not point to evidence which shows Cyril had a water well in the Duncan but insists Mobil "opened the door" regarding inquiry relating to contamination of the Duncan.

The record indicates it was Commission who first objected to a portion of an exhibit because the exhibit referred to the Duncan which was not a part of the Application. Testimony surrounded one contamination event with one CIU well into the Duncan sandstone which Mobil asserts has a depth of between 850 to 950 feet. The attorneys then engaged in a discussion regarding whether the Rush Springs as referred to in the document really included or was in communication with the Duncan. Commission withdrew its objection and the ALJ proceeded to take testimony on the exhibit at Mobil's counsel's request.

Mobil's due process argument is not well taken. Not only did it not object to the exhibit based on this ground, it pressed for another question on the exhibit. The Application and Pretrial Conference Agreement relate to the extent and sources of contamination of Cyril's water supply, and specifically whether the Rush Springs Aquifer was contaminated. Mobil admits there was much conflicting evidence regarding whether the Application area had one regional hydrologic unit from the surface to 950 feet. Thus, it was important to determine what the Rush Springs consisted of and whether it was in communication with other formations. The testimony elicited regarding the contamination event was within the parameters of the issues being tried. We hold Mobil's right to due process was not violated.

24. Mobil included a copy of the Plan of Unitization of the CIU in its brief to this Court and contends we should take judicial notice of the Plan under 12 O.S.1991, §§ 2202, 2203 because

Mobil's sixth proposition of error is basically a collection of challenges to several of Commission's factual findings regarding whether Mobil's CIU operations caused contamination to the Rush Springs/Marlow aquifer or whether the contamination came from pre-CIU pit usage (essentially its second proposition). Mobil contends the evidence does not support Commission's determination regarding the amount of injectate Mobil actually recovered, whether pits were evenly distributed between the E/2 and the W/2 of Section 6, whether an impermeable shale barrier exists at approximately 100' throughout the Application Area, whether there was a hydrocarbon layer in old pits which prevented leaching, whether the high chloride level beneath the pits was caused by CIU surface flows or by the pits, and whether the increases in the chloride levels in certain Cyril wells was caused by escaped injection fluids. Our review of the evidence indicates there is substantial evidence in the record of each violation above-described.

■ Mobil next contends the working interest owners in the Unit, including Union and American, should be jointly and severally liable with Mobil for any liability arising from CIU operations. It reasons because Mobil was the Unit operator acting as agent for the working interest owners, the principals (these owners), should have liability under *Branch v. Mobil Oil Corp.*, 788 F.Supp. 531 (W.D.Okla.1991).[24]

In *Branch*, the District Court for the Western District of Oklahoma determined summary judgment was inappropriate because a genuine issue of material fact existed as to whether the defendant oil company was a working interest owner in a secondary recovery unit. Property owners brought an action against the oil company for pollution which allegedly occurred within the unit. The District Court held that if the defendant oil company was a working interest owner in the unit during the time the operator of the unit created or maintained a nuisance, then

it is a public record filed with the Corporation Commission. Even if the plan were properly before us, we need not consider it to dispose of Mobil's contention.

the working interest owner could be liable as a principal for the operator-agent's actions unless the operator was acting outside the scope of its authority. *Branch*, at 533. The court examined the definition of "unit expense" contained in 52 O.S.1991, § 287.8, and concluded the definition was arguably broad enough to encompass costs or indebtedness in the form of legal liability for pollution cased by unit operations.

In *Texola Drilling Company v. Oklahoma Corporation Commission*, 281 P.2d 405 (Okla.1955), the unit operator had assessed one of its lessee members with a share of the cost of establishing and operating the unit and the lessee had refused to pay. After the unit operator filed an action in district court to foreclose its claimed lien, the lessee applied to the Commission for an order interpreting the original order as denying the unit's cause of action. The Commission denied the lessee's application. The Court held the fact that the plan of unitization may have provided for foreclosure of the lien does not require any action on the part of the Commission. Even if the Commission had amended the plan, it could not affect the unit's right to foreclose such lien in district court if the law gives it such right. The Oklahoma Supreme Court determined the Corporation Commission is without jurisdiction to render a money judgment or foreclose a lien provided for in the Plan of Unitization. See also *Tiger Flats Production v. Oklahoma Petroleum Extracting Co.*, 711 P.2d 106 (Okla.1985).[25]

With these and other above-cited jurisdictional authority in mind, we conclude the Commission did not err in refusing to assess against Union and American, liability as working interest owners under the plan of unitization and the authority of *Branch.* Any cause of action Mobil may have against its working interest owners under the plan of unitization is properly brought in district court.

Next, Mobil challenges the Commission's order regarding Union's liability for contamination caused by Anderson–Prichard Oil Corporation (Anderson).[26] The ALJ found Anderson operated producing wells, used saltwater evaporative pits and conducted land spreading during primary production which caused contamination of the Cyril water supply. The ALJ stated on November 1, 1960 Union purchased "certain leasehold interests" of Anderson and in 1962, Union actively operated the leases until Mobil began unitization in 1970. The ALJ further found "the employees of Anderson Prichard became the employees of Union Texas and the Anderson Prichard Oklahoma City office became the Union Texas office".[27] In 1986, Union sold its working interest in the CIU to American.

The ALJ determined Union was *not* be liable for *Anderson's liabilities* under the theory that its purchase of Anderson's leases and assets, the retention of employees and office or the receipt of Anderson's business records made Union the same entity as Anderson. The ALJ stated there had been no showing that Union had an express or implied agreement to assume the liabilities of Anderson or that Union would be liable under the theories of same corporate identity or fraud. However, the ALJ concluded Union was jointly and severally liable because it violated Commission rules which contributed to the pollution of the aquifer.

---

25. In *Tiger Flats*, the operator of a § 287.1 unit sued lessees for a personal money judgment and foreclosure of lien against their leasehold interest for their failure to pay their proportionate share of unit expenses. The Oklahoma Supreme Court affirmed the trial court's judgment for the operator and foreclosure under 52 O.S.1991, § 287.8.

26. We have chosen to refer to Anderson–Prichard Oil Corporation as "Anderson" instead of Apco because Mobil contends Anderson and Apco Oil Corporation are two distinct corporate entities.

27. Mobil contends the facts show the sale of assets by Anderson to Mobil included all of Anderson's oil and gas properties in the United States and that Anderson was dissolved after and as a result of the sale. Mobil says that as a part of the sale, Anderson sold all of its transportation, refining and marketing assets to "Apco Oil Corporation" which was a separate and distinct entity. The documents establishing these facts, Mobil says, were never introduced as Mobil and the other respondents rested without putting on their cases in chief.

The Commission upheld the ALJ's conclusion regarding Union's liability, finding:

UTP (Union) has direct liability for pre-CIU pollutants. It acquired the leases from the now defunct APCO, which had contaminated soils from abandoned saltwater evaporation pits, land spreading and spills. Chlorides leached from those soils into the Upper Rush Springs Aquifer. UTP claims that prior to this cause, it did not know about the disposal problems created by APCO or other operators on those tracts. However, the record in this cause clearly shows that the nature of production and disposal practices can be determined from a combination of: Commission records, ASCS aerial photographs and operator records, especially the APCO records. UTP is also responsible for soils contaminated by saltwater spills during its pre-CIU operations. * * * Consequently, UTP was an operator of active contaminant sources. Furthermore, it has jointly and several liability with other polluters of the Upper Rush Springs Aquifer, because its contribution to plume development cannot be determined separately. With respect to the APCO/UTP pre-CIU injection operations, there is no evidence of pollution attributable to subsurface injection by either operator.

Thus, Union's liability for pre-CIU operations on old Anderson leases stems from its affirmative violations of Commission rules. Whether Union is also liable under the theory of continuation or same corporate entity, as espoused by Mobil, is at this point, academic.

■ Finally, Mobil maintains Commission erred in failing to hold American responsible for contamination from abandoned Anderson saltwater pits.[28] Mobil argues that just as the Commission determined Union was liable for Anderson's nuisance, so should American be liable for Union's nuisance.

The Commission's Order held that although American was the successor in interest to Union in 1986, it does not share the same direct liability as Union and should be dismissed because it *never had an opportunity to control or remediate the sources of pollution* during Mobil's unilateral control of the CIU properties.[29] American obtained Union's interest in the area in 1986, *after* the area was unitized for secondary operations and being operated by Mobil.

This approach by Mobil seems to be a back-door approach to liability under *Branch,* supra. Mobil contends there is no distinction between an operating working interest owner and a non-operating working interest owner for purposes of liability. As far as Mobil's comparison of American to Union, Commission Rule 165:10–7–5 provides: All operators, contractors, drillers, service companies, pit operators, transporters, or other persons shall at all times conduct their operations in a manner that will not cause pollution. It is uncontroverted American was not an operator or other person "conducting operations" under this rule and that Mobil was. Thus, for purposes of violating Rule 165:10–7–5, there is a material distinction between Mobil and American.

■ With regard to Mobil's contention American is liable because the pits on its leases continue to contribute to contamination, the Commission's findings indicate that the pits should, at this point, be considered as "historic sources" of contamination rather than active sources of percolating chlorides. Monitoring wells at former pit sites indicate most of the chlorides have leached out except in places where oil residues have blocked their downward migration. The Commission continued, "the continuing percolation of chlorides from pit sites is not significant enough to justify removal of soils from the large former pits". Mobil has failed to demonstrate either that in 1986 or

---

28. Mobil has argued American is liable on two bases: 1) that as a working interest owner of the CIU, American is jointly and severally liable under *Branch,* supra, and 2) that it owned oil and gas leases upon which were located old saltwater disposal pits which continued to contaminate the water supply. The first basis was addressed previously.

29. The Commission found American did not operate any leases, utilize any pits, or conduct any landspreading in or on the subject lands and that it did not cause any contamination of the aquifer or violate any statute, order, rule or regulation.

today, American maintained an active source of contamination on its leases. The Commission's findings that American is not directly liable as a successor-in-interest through Union, did not cause contamination and did not violate any statute or rule or regulation, is supported by substantial evidence.

### UNION'S APPEAL

Union raises several propositions of error:

1. error in finding Union liable because Union's operations did not cause contamination and Union is not responsible for saltwater pits. (Mobil is responsible for all contamination);

2. Union is not liable as a "successor in interest";

3. Any liability Union has is not joint and several, but should be apportioned; and

4. error in determining that liability in Phase II cannot be relitigated and that new parties cannot be joined.[30, 31]

■ In the first two propositions, Union challenges the Order maintaining there is no evidence Union's operations caused contamination to the Rush Springs aquifer, that Union is not responsible for contamination caused by saltwater evaporation pits and it has no liability as a successor in interest. This contention was discussed above in the disposition of Mobil's appeal. Both the ALJ's findings and the Commission's order conclude, and there is in fact evidence, that there were leaks from Union's tanks and lines, and that dike overflows were simply covered with gravel. There is evidence that the pits continued to be a source of contamination during the 1960's when Union operated the leases. Through Anderson's records, Union should have been aware of the continuing contamination of the aquifer. Although the testimony of Union's pumper indicates the amount of saltwater which escaped from the gathering system or tanks may have been small in relation to the overall contamination of the aquifer, it is sufficient to establish liability by showing Union violated

Commission rules and regulations while it operated the leasehold. As we have already affirmed Commission's order regarding Mobil's liability, we need not discuss Union's contention Mobil's CIU operation's caused contamination of the aquifer except insofar as that relates to Union's contention joint and several liability is inappropriate.

■ Union maintains Commission erred in assessing joint and several liability against Mobil, Citation and Union. We affirm Commission's determination liability should be assessed on a joint and several basis. Commission determined liability would be joint and several because it was impossible to apportion each Respondent's contribution to the contamination of the Cyril water wells. The ALJ found:

"Union Texas' proposed method of apportioning liability is contrary to the evidence adduced in this cause. The evidence established that the amount of contribution to contamination of the aquifer from the different sources could not be determined. Thus, there is no basis to apportion any of the liability. Therefore, at least at this stage, there is no basis for apportionment and the liability should be considered joint and several and, at least for the purposes of the investigation to be conducted, those costs should be borne equally between Mobil and Union Texas subject to the results determined by the investigation."

Commission, of course, modified this finding in part by adding Citation and by precluding the relitigation of liability in Phase II.

■ The single, indivisible injury at issue in this case is the contamination of the town of Cyril's water supply by saltwater used in oil and gas operations. The general rule is that where several persons are guilty of separate and independent acts of negligence which combine to produce directly a single injury, the courts will not attempt to apportion the damage, especially where it is impracticable to do so, but will hold each

---

30. This contention regarding joinder of parties and relitigating liability has been previously discussed.

31. Union's last "proposition", that certain portions of the ALJ's summary of evidence are inaccurate and its recitation to portions of the record containing testimony regarding those portions of the summary, is noted.

joint tort-feasor liable for the entire result. *Harper–Turner Oil Company v. Bridge,* 311 P.2d 947 (Okla.1957). To make tortfeasors jointly liable, there must be a single injury, there must be community in the wrongdoing and the injury must be in some way due to their joint work. *Harper–Turner Oil Company,* at 952. It is not necessary that they be acting together or in concert if their concurring wrongful acts occasion the injury. *Id.; British–American Oil Producing Co. v. McClain,* 191 Okla. 40, 126 P.2d 530 (Okla. 1942); *Indian Territory Illuminating Oil Co. v. Bell,* 173 Okla. 46, 46 P.2d 481 (Okla. 1935).

Union maintains apportionment is possible under the following formula: There were a total of 139 wells drilled in the CIU area prior to 1970; Union operated 27 of those wells (19% of them); 300,000 bbl. of saltwater were disposed of in pits or landspread during primary production; 19% of 300,000 bbl is 58,000 bbl. Since there were 25 million barrels of unaccounted-for saltwater that were lost during Mobil's CIU operations, Union's 58,000 bbl. contribution is only .23% of 25 million bbl. and Union's liability is thus .0023. This formula, however, fails to consider the Commission's finding that of the 25 million bbl. of lost injectate, only 700,000 to 1,000,000 bbl. entered the treatable water zones within the Rush Springs and Marlow formations. Union's formula is based on the number of wells they operated compared to the number of wells operated by others in the CIU. It is not based on the actual amount of saltwater produced from or disposed by Union's leases. Because of the lack of data on who actually owned all the pits on the leases and the actual volumes for disposal into the pits and volumes of spills, there is no evidence to conclude Union's leases only contributed 19% of the 300,000 bbl. of saltwater during primary production. If apportionment is impossible, the imposition of joint and several liability for the single injury is proper. We conclude Commission did not err in determining Mobil and Union's liability for contaminating Cyril's water wells is joint and several.

Order No. 372735 is therefore REVERSED IN PART AND AFFIRMED IN PART. Commission's determination that Citation has violated Rule 165:10–7–5 because it failed to remove the saltwater or arrest its down-gradient movement is not supported by substantial evidence. That part of Order No. 372735 which requires Citation to pay for costs associated with the execution of the Phase I plan is REVERSED. Citation may be joined as a party in Phase II of this proceeding and its liability for saltwater contamination may be litigated at that time. All other portions of Order No. 372735 are AFFIRMED.

ADAMS, J., concurs.

JONES, Judge Dissenting:

The Statutes of the State of Oklahoma, as they existed at the time this action was brought and at the time the order here considered was entered, did not give the Commission jurisdiction to order remediation. Title 52 O.S.1993 § 139 was effective July 1, 1993, and only then did the statutes grant that authority. This court should not infer that jurisdiction existed prior to that time because the Commission only is vested with the power granted by statute.